[Crim. No. 4551. In Bank. Feb. 7, 1945.]

THE PEOPLE, Respondent, v. C. T. THOMAS, Appellant.

H. E. Manning and George Olshausen for Appellant.

Robert W. Kenny, Attorney General, and David K. Lener, Deputy Attorney General, for Respondent.

SCHAUER, J.—This is an appeal from a judgment imposing the death penalty for murder in the first degree and from an order denying defendant's motion for a new trial. It is contended, among other things, that the evidence is insufficient to establish the homicide as murder of the first degree, that it shows at most murder of the second degree or man-

slaughter, and that the trial court erred to the prejudice of defendant in instructing the jury relative to the elements of the two degrees of murder and the burden of proof.

Upon an examination of the record it appears to us that the evidence, while not wholly insufficient as a matter of law to support the adjudication of first degree murder, is ample to sustain a finding that the homicide was manslaughter or murder of the second degree. It was, therefore, incumbent upon the jury to resolve the material conflicts in the evidence, including the divergent inferences, and thereupon to determine the class or degree of the offense. In order to make such determination it was essential that the jury be adequately and accurately informed as to the elements of each of the degrees of murder as well as those pertaining to manslaughter, and as to the burden of proof in relation to them. While it is said that the jury makes the determination of the degree or class of the offense, it is not implied that the jury has any discretion, other than in resolving factual issues, in so classifying the offense. The standard for classification is prescribed by law. The function of the jury is to consider the evidence, find all the material facts, and upon those facts, in the light of a full knowledge of all the elements essential to proper discrimination among the several offenses or degrees of offenses which are included in the charge and which can be deduced from the evidence, to apply the law as written. (*People* v. *Holt* (1944), *ante,* pp. 59, 90 [153 P.2d 21].) Unless the distinguishing elements of the several degrees and classes of offense which might be found from the evidence are adequately and accurately declared by the court the jury would either be misled or given the prerogative of fixing the standard as well as finding the facts. Neither alternative could be sustained. As hereinafter set forth more fully it appears that the court erred in four material instances: (1) It failed to adequately define murder of the second degree with respect to differentiating it from murder of the first degree; (2) it instructed the jury, in effect, that a homicide embodying merely the elements of second degree murder could be found to be murder of the first degree; (3) it gave an instruction readily susceptible of the interpretation that upon a homicide being shown the burden was upon the defendant to prove circumstances mitigating it from first degree to second degree murder; (4) it impliedly excluded from consideration by the jury (per-

tinent to the *degree of the murder*) any extent of provocation insufficient to reduce the homicide to *manslaughter*.

In declaring the errors above enumerated it is but fair to the trial judge to mention that over a period of years the decisions of this court and of the District Courts of Appeal have shown substantial inconsistencies and obfuscation of concept as to the elements of the two degrees of murder, as was recently pointed out in our opinion in *People* v. *Holt* (1944), *supra, ante,* pp. 59, 84-89. As is also shown in that opinion, however (p. 89), the intent of the Legislature to recognize differing degrees of human culpability and frailness is also manifest and it is our duty to require that such intent be given effect.

In order to make readily apparent the probable prejudicial effect of the above mentioned errors in instructions it is proper to summarize the facts of the case. At the time of the homicide the defendant C. T. Thomas and Bernice Owsley had been living together as man and wife for approximately four years without benefit of ceremonial marriage. They had one child about fifteen months old. Bernice's mother, Effie Banks, lived with the family. Both the defendant and Bernice were employed in war industry. Bernice worked from eight in the morning to four in the afternoon; the defendant worked from midnight to eight in the morning. Mrs. Banks cared for the child during absence of the parents. As they resided a substantial distance from defendant's place of employment it was necessary for defendant to leave the house shortly after 10 p. m. in order to meet his shift at the shipyard.

On October 23, 1943, the entire family spent the evening at home. Defendant and Bernice appeared to be friendly; they had been in bed together; after they left the bedroom they "played" together in the kitchen. As stated by Mrs. Banks, "They were playing when he left the house" and she did not "hear or see anything that occurred that night that would indicate there was any trouble brewing between them." At the time defendant left, about 10:30 p. m., Bernice, who had already been in bed, "wasn't dressed, she had a princess slip on." Shortly thereafter she dressed (in a sweater and skirt) to go out. About 11 p. m. or a little later defendant returned, unexpected by Bernice and her mother, and remained outside the house for a few moments overhearing an asserted conversation. He had either missed the bus or,

being doubtful of Bernice's fidelity, had deliberately come back to test his doubt. He testified that he "missed the bus" but he told police officers and the district attorney shortly after the shooting that Bernice had been "running around" and "cheating on him" and that "I pretend to go to work. I left her in bed and act like I was going to work, but I came back and she had her clothes on. Her mother stays there with her and she said, 'You'd better be careful or C. T. is going to catch you. You shouldn't do things like that. He takes good care of you and you shouldn't treat him that way.' And she says, 'Oh, damn C. T. . . . He'll soon be in the Army now.'"

Mrs. Banks, as a prosecution witness, denied the substance of the above related conversation but she admitted on cross-examination that there had been some talk about going "down to the Knotty Pine," an establishment which, it appears, provided for its patrons the transient use of private rooms. The transcript shows the following: "Q. . . . [D]id you say that she [Bernice] was playing the radio and with the music playing that Bernice said to you, 'Let's go down to the Knotty Pine?' . . . Did you say that to the district attorney in describing what your daughter said to you while she was playing the radio after Thomas had left for work? A. I did say that to him, and I explained to him while the music was playing Bernice was explaining to me, and she was explaining to me, 'Let's go down to the Knotty Pine.' And Bernice knew I didn't go to places like that, and Thomas knew I didn't go to places like that."

After the conversation with Bernice, whatever it was, Mrs. Banks entered the bathroom to draw water for a bath. She soon heard Bernice call, "Mama, come quick, and don't let C. T. kill me." She responded to the call. Defendant had entered the house. She saw him "with his arm around Bernice's elbows. She was drawn very tight in his arms." Mrs. Banks said she "asked him not to hurt Bernice" and that "He told me to get back, I was ring-leader, or he would give me the same. . . . *He looked to be very angry to me.* [Italics added.] . . . When he asked me to back off he had his hand in his pocket and he pointed and told me to get back." Defendant, Mrs. Banks, and Bernice struggled through the house; defendant pushed Bernice out the front door; the struggle continued; and eventually defendant threw Bernice off the porch. During the altercation on the porch one

Walter Bell, a neighbor, passing by across the street, was called to for help. He started to cross toward the melee but heard Mrs. Banks say, ''He has a gun,'' whereupon the witness, in his own language, ''turned around . . . and I went on about my business.'' After defendant had thrown Bernice from the porch ''He stood on the stairs [porch steps] until she got up.'' Bernice ran and defendant pursued her down the street or court (south) a substantial distance and then back in a northerly direction. The witness Bell said that ''I could hear her pleading, 'Please don't kill me, I haven't done anything.' . . . They were talking but I didn't understand, but I could hear that because she talked so loud. I started moving along a little bit and walked slow and looked back all the time and pretty soon I heard a shot and a flash in my direction, and I took off fast, quick, and I went to this house and I heard three shots . . . then I stood there a few minutes and started to go ahead, and then I heard two more shots, but . . . I went on to the bus.''

From other evidence it appears that five shots from an automatic .32 caliber pistol were fired by defendant, four of them taking effect in the body of decedent. At least two of the wounds, in the opinion of the autopsy surgeon, were in vital areas. The defendant went to his home, took the baby to a neighbor whom he requested to care for the child, and returned to the body of Bernice where he awaited arrival of police. When the officers arrived he raised his arms above his head and said, ''I did it. I won't try to run away.'' He indicated the position of the pistol which was removed from his person by the arresting officer. From blood on defendant's clothing and from a statement made by him it appears that he caught Bernice once after wounding her (apparently after the first shot), that she broke away, that he pursued her again and fired more shots into her body, the last (inferentially) passing through her brain.

About fifteen minutes after the officers arrived (they had arrived at the scene about twenty minutes after the shooting) one of them (Deputy Sheriff Olson) had further conversation with the defendant and concerning it testified: ''[H]e said, 'a person like that,' or words similar to those words, deserved to be shot. . . . I asked him why he shot her and he said because she was running around. And I asked him if she had done this often and he said yes, she had. . . . He said she had been doing it for some time. He said this

night he stayed home and caught her at it. . . . We stated some more but I really don't recall. . . . [H]e seemed very cool, very cool, calm and collected.''

Deputy Sheriff DeVarney testified that ''I asked Mr. Thomas if he was sorry that he had shot this woman and he stated that he wasn't, that he had been—that she had been cheating on him for some time and he had planned to do this before but all he was worrying about now was the fact that he wanted his mother to have the baby; there seemed to be a baby involved, he just stated. I asked him if, if— Oh, he stated then that the fellow involved was across the street, a fellow named Big.''

The defendant himself, in a statement made to the district attorney about two or three o'clock in the morning of October 24, a few hours after the shooting, which statement was taken down in shorthand, said that he had been living with Bernice for four years, that before coming to California in February of 1942, while they were residing in St. Louis, Missouri, ''she gave me some trouble running around there, I caught her several times there with fellows. She promised me she wouldn't do it any more. I wasn't satisfied then so I'd rather leave town than not be satisfied. So I came out here to go to work. . . .'' Bernice came out in March or April of 1943, bringing the baby, and she and defendant resumed cohabitation. In response to the direct question ''When did your last quarrel take place?'' the defendant replied, ''It was just tonight. I kept telling her about it. See, I works graveyard shift and I go to work and leaves her in bed. She gets up and goes out.'' He was then asked, ''You figure that she has been going out after you left?'' and he answered, ''I don't figure—I know. You know I ain't no fool—*I laid in wait to catch her.*'' (Italics added.) He then detailed his pretense of going to work, his return, his overhearing the asserted conversation above mentioned, and said, ''I just got mad and I grabbed my pistol. . . . She broke and run on out and I ran after her and shot her.''

In determining the degree or class of the homicide the most crucial question before the jury was whether the defendant in forming and carrying out the intent to kill Bernice acted with deliberation and premeditation or in the heat of passion upon substantial provocation. The question was at best a difficult one for the jury to solve because, upon the record here, it involved not only a problem of conflicting

evidence and inferences but also probably a determination of the relative extents in which the mental processes of defendant were characterized by deliberation on the one hand and passionate impulse on the other. If, previous to his return home on the night of October 23, the defendant had considered and formed the intent to kill Bernice if he caught her "running around" again then unquestionably the homicide would be murder of the first degree and the mere fact that he was angry at the time would not mitigate the degree. On the other hand if the intent to kill was entirely unformed and unconsidered prior to that evening and if it was a product purely of hot anger of the moment and was executed without reflection, without revolving the thought beforehand, then such homicide could be no higher offense than murder of the second degree.

The evidence on the point under discussion cannot be said to point unerringly to one conclusion. Aside from oral admissions of the defendant it tends strongly to show some degree of provocation and hot anger; it admits of conflicting inferences as to whether there were deliberation and premeditation. The defendant said that Bernice had been unfaithful to him before and it is apparent that his belief in that regard had a strong effect upon his conduct, but that is not tantamount to saying that he had previously determined to kill her if he again caught her transgressing the standard he invoked. He apparently had been feeling very friendly toward Bernice just before and at the time he left the house. Mrs. Banks said that he "looked to be very angry" when she first saw him after his return. He did not shoot Bernice then; neither did he shoot her as she lay on the ground almost beneath him after he had ejected her from the house and thrown her from the porch. The jury could have inferred that he did not then shoot because he had not then formed the intent to kill. Perhaps the jury on the other hand could have inferred that he already had determined to kill her but was temporarily frustrated in his intent by the struggle with Bernice and Mrs. Banks. But the question is a close one and the defendant was entitled to have it determined upon proper instructions as to the law.

As to the admissions of defendant it is code law that evidence of the oral admissions of a party is to be viewed with caution. (Code Civ. Proc., § 2061(4).) His statement that he had "laid in wait to catch her" apparently refers to other occasions when assertedly he had caught her going out

surreptitiously. But regardless of whether it refers to other occasions or to this occasion, as a matter of law it does not on its face and in its context justify the claim on behalf of the state that it constitutes an admission of lying in wait to commit murder. Not only is the admission in itself inadequate to support such a theory but all the evidence in the case touching on the subject tends to show a homicide of a character other than a lying-in-wait or ambush murder.

The asserted admission related by Deputy Sheriff De-Varney—"that she had been cheating on him for some time and *he had planned to do this before*" (italics added)—if those were the exact words used by defendant and if they mean what the state contends, was the most direct and important evidence in the trial on the question of degree of the offense. But, however conscientious an officer may be, it is possible for him to misapprehend words or suffer a fault of memory. In addition to the statutory admonition to view evidence of oral admissions with caution there were other incidents of this admission which the jury were bound to consider. On this highly important point the officer made no inquiry as to what the defendant meant by the words "do *this* before" or what the preconceived plan contemplated, whether it was a plan merely to catch Bernice "running around," a plan to pretend to start to work and then return to watch her, or a plan to kill her. And the officer "forgot about it completely" and reported it to no one until, more than three months later, he testified on the witness stand. The transcript shows the following:

"Q. Did you ask what he meant by he had planned to do this before? A. No, sir, he told me it was because she was cheating.

"Q. Did you make any notes of what he told you on this occasion? A. No, sir.

"Q. Have you ever made any written notes? A. No, sir, no written notes. . . .

"Q. Did you ever make a report about what you have stated on the witness stand to anyone? A. No, never made any report.

"Q. When was the first time you told an officer or otherwise what your testimony would be here today? A. I couldn't recall that.

"Q. Was it within the past few days? A. No, I forgot about it completely.

"Q. You forgot about it completely? A. Yes.

"Q. What caused you to remember? A. Well, I was there, I should remember."

The above related evidence fairly depicts the difficult case which was submitted to the jury. The need for adequate and correct instructions covering the elements of second degree murder as well as those pertaining to murder of the first degree and manslaughter is obvious. The instructions which were given are in material part as follows:

"Murder is the unlawful killing of a human being with malice aforethought. . . . [Malice defined.]

"All murder which is perpetrated by means of poison or lying in wait, torture, or by any other kind of willful, deliberate and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary or mayhem, is murder of the first degree, and all other kinds of murder are of the second degree. . . . [Manslaughter defined; specifically enumerated types of first degree murder stated.]

"But there is another and much larger class of cases included in the definition of murder in the first degree, which are of equal cruelty and aggravation with those enumerated, and which, owing to the different and countless forms which murder assumes, it is impossible to describe in the statute. In this class the legislature leaves the jury to determine from all the evidence before them, the degree of the crime, but prescribes for the government of their deliberations the same test which has been used by itself in determining the degree of the other two classes, to-wit: The deliberate and preconceived intent to kill. It is only in the latter class of cases that any difficulty is experienced in drawing the distinction between murder of the first and murder of the second degree, and this difficulty is more apparent than real. The unlawful killing must be accompanied with a deliberate and clear intent to take life in order to constitute murder of the first degree. The intent to kill must be the result of deliberate premeditation. It must be formed upon a pre-existing reflection and not upon a sudden heat of passion sufficient to preclude the idea of deliberation.

"There need be, however, no appreciable space of time between the intention to kill and the act of killing—they may be as instantaneous as successive thoughts of the mind. It is only necessary that the act of killing be preceded by and

the result of a concurrence of will, deliberation and premeditation on the part of the slayer, and if such is the case, the killing is murder in the first degree, no matter how rapidly these acts of the mind may succeed each other, or how quickly they may be followed by the act of killing.

"If the unlawful killing is done without the provocation and sudden passion which reduces the offense to *manslaughter*, or is done in the commission of an unlawful act, the natural consequences of which are dangerous to life, or is committed in the attempt to perpetrate a felony other than those mentioned in the description of murder in the first degree, or the circumstances of the killing show an abandoned heart, this is murder of the second degree, *unless the evidence proves the existence in the mind of the slayer of the specific intent to take life. If such specific intent exists at the time of such unlawful killing, the offense committed would of course be murder of the first degree.*

"Manslaughter, as you have already been instructed, is the unlawful killing of a human being without malice.

"If under the evidence herein you are convinced to a moral certainty and beyond a reasonable doubt that the defendant is guilty of the crime of murder, that is to say, that he unlawfully killed said Bernice Thomas, also known as Bernice Ousley, with malice aforethought, but still if you entertain a reasonable doubt whether the said killing was wilful, deliberate and premeditated, then in such case you cannot find the Defendant guilty of murder in the first degree.

"I instruct you that before you may find the defendant guilty of murder of the second degree, you must find that he unlawfully took the life of deceased with malice aforethought.

"Manslaughter is principally distinguishable from murder in this: That though the act which occasions the death be unlawful or likely to be attended with bodily mischief, yet the malice, either express or implied, which is the very essence of murder, is presumed to be wanting, and the act being imputed to the infirmity of human nature, the correction ordained for it is proportionately lenient.

"You are instructed that the defendant can be convicted of no greater crime than voluntary manslaughter if the jury believe from all the facts and circumstances as may be shown by the evidence in the trial of this case that the defendant did not act with malice aforethought.

"You are instructed that to reduce a felonious homicide from the grade of murder to that of *manslaughter* upon the ground of sudden quarrel or heat of passion, the provocation must be of such a character as would be naturally calculated to excite and arouse the passions and it must appear that the party acted upon the smart of sudden passion and resentment.'

"The sufficiency of provocation to reduce a homicide from murder to *manslaughter* and whether defendant did in fact act under such provocation are questions of fact for the jury. . . .

"Provocation, as the term is used in law, means that treatment of one person by another which arouses passion and anger. In cases of homicide it negatives the idea of malice and premeditation because the hot blood engendered by provocation produces a temporary suspension of the reflective faculties, and the passion aroused excludes the idea of deliberation. *Therefore,* evidence tending to establish provocation may be considered by you and if, after due consideration of such evidence, you should entertain a reasonable doubt as to whether there existed at the time of the homicide in the mind of the defendant the malice, deliberation and premeditation essential to constitute the crime of *murder,* it would be your duty to *acquit* the defendant of the charge of *murder.* . . .

"I instruct you that if you find from the evidence that the defendant inflicted the wounds which caused death in a sudden transport of passion excited by what the deceased said, or did, or disturbed by preceding events, which for the time disturbed his reasoning faculties and deprived him of the capacity to reflect, or while under the influence of some sudden quarrel or heat of passion, *the imputation that he acted with malice aforethought is rebutted and the act is not murder.* . . .

"Upon a trial for *murder,* the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation or that justify or excuse it, devolves upon the defendant, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to *manslaughter or that the defendant was justifiable or excusable* [sic]." (Italics added.)

██ Considering first the last paragraph of the above quoted instructions (all of which were given of the court's own motion) in connection with the other instructions, it is

apparent that there is at least an implication that upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances to mitigate the offense from murder of the first degree to that of the second devolves upon the defendant. That is not the law. ▉ In order to establish murder of the first degree the burden is upon the prosecution to produce evidence which satisfies the minds of the jurors beyond all reasonable doubt not only that an unlawful homicide with malice aforethought was committed by the defendant but also that such homicide was of a type specifically enumerated in the statute as being murder of the first degree or was of equal cruelty and aggravation with those enumerated and was accompanied with a deliberate and premeditated intent to take life. ''When the killing is proved to have been committed by the defendant, and nothing further is shown, the presumption of law is that it was malicious and an act of murder; but in such a case the verdict should be murder of the second degree, and not murder of the first degree.'' (*People* v. *Howard* (1930), 211 Cal. 322, 329 [295 P. 333, 71 A.L.R. 1385]; see, also, *People* v. *Knapp* (1886), 71 Cal. 1, 6 [11 P. 793]; *People* v. *Ford* (1927), 85 Cal.App. 258, 263 [258 P. 1111].)

▉ The instruction was in the language of the code (Pen. Code, § 1105), but, as declared by Mr. Justice Traynor in his concurring opinion in *People* v. *Albertson* (1944), 23 Cal.2d 550, 587 [145 P.2d 7], ''An instruction in the language of a statute is proper only if the jury would have no difficulty in understanding the statute without guidance from the court. [Citations.] It is not proper if reasonable men might differ as to the construction of the statute, for it would delegate to the jury the function of statutory interpretation that belongs to the court. [Citations.]'' ▉ Not only is the instruction under the facts of this case subject to the precise criticism levelled at it by Justice Traynor in the Albertson case (failure to define the extent of the duty insofar as degree of proof was concerned, the effect of which failure standing alone we do not now consider) but also, here, such instruction is erroneous in that the jury were not advised that it has no application whatsoever in determining the degree of murder, if the homicide is found to constitute murder, but is pertinent (if it ever should be given as an instruction even with **proper explanation**) only in relation to determining whether the homi-

cide constitutes murder or manslaughter or is justifiable or excusable. Although the giving of instructions embodying the substance of that section has been countenanced or approved in a number of cases, with a variety of comments and limitations (see concurring opinion of Justice Traynor in the Albertson case, pp. 586-587 of 23 Cal.2d, for listing of such cases), logic suggests that since such section in reality merely declares a rule of procedure and does not relieve the state of the burden of proving each and every essential element of guilt beyond a reasonable doubt the propriety of reading it to the jury, even with a proper explanation, is doubtful.

■ It is true that the court here also instructed the jury that "the law raises no presumption whatever against the defendant, but on the contrary, every presumption of the law is in favor of his innocence and . . . every material fact necessary to constitute such crime must be proved beyond a reasonable doubt and, if you entertain a reasonable doubt upon any single fact or element necessary to constitute the crime, it is your duty to give the defendant the benefit of such doubt and *acquit him.*" (Italics added.) Such instruction is eminently proper on the general issue of guilt or innocence but as it concludes with a direction to *acquit* if the doubt is entertained it obviously is not applicable to the question of degree or class of homicide. Furthermore, it was not, by its terms, expressly made applicable to the evidence of mitigating circumstances. (See comment of Justice Traynor in *People* v. *Albertson* (1944), *supra,* 23 Cal.2d at p. 588.)

■ Likewise the instruction that if the jury "have a doubt as to the degree of the offense of which the defendant is guilty . . . the jury will give the defendant the benefit of such doubt and find him guilty only of the lowest offense as to which they may find him guilty beyond a reasonable doubt," although it is a correct statement of the law, does not necessarily to the lay mind eradicate the confusion naturally arising from the prior seemingly inconsistent instruction that "Upon a trial for *murder,* the commission of the homicide by the defendant being proved, the *burden of proving* circumstances of mitigation . . . devolves upon the defendant, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to *manslaughter. . . .*" (Italics added.) (For discussion as to the effect of error in instructions in a criminal case where

the verdict is based on substantially conflicting evidence, see *People* v. *Dail* (1943), 22 Cal.2d 642, 650 [140 P.2d 828]; *People* v. *Silver* (1940), 16 Cal.2d 714, 723 [108 P.2d 4].) Here the defendant was on trial for murder, the homicide was proved and admitted and the proof on the part of the prosecution evidently was regarded by the jury *not* as showing that "the crime committed only amounts to manslaughter." Thus there was left for the jury no apparent application of the instruction unless it was to be regarded as placing on the defendant the burden of proving circumstances of mitigation to reduce the offense from murder of the first degree to that of the second. And as to whether such burden required the defendant to adduce evidence which proved those circumstances by a preponderance of the evidence or beyond a reasonable doubt or sufficient merely to raise a reasonable doubt, the jury were wholly uninstructed unless by a process of lawyerlike science they could deduce some inference from the general instructions.

As heretofore suggested the responsibility of statutory construction should not be left to the jury. The interpretation of a statute and the question of its applicability to any given set of facts are exclusively the province of the court. It was the duty of the court, if it gave the instruction at all, to definitely inform the jury that such instruction had no application whatsoever to a determination of the degree of the murder if the offense was found to be murder (see *People* v. *Howard* (1930), *supra*, 211 Cal. 322, 329) or to fixing the punishment if the offense was found to be murder of the first degree (see Pen. Code, § 190; *People* v. *Bollinger* (1925), 196 Cal. 191, 207-209 [237 P. 25]); furthermore, that the rule could be considered only in connection with the question as to whether the homicide amounted to murder or manslaughter or was justifiable or excusable, that on such question no more was required of the defendant than that he adduce evidence of circumstances sufficient to raise a reasonable doubt on the particular issue, if the prosecution evidence did not in itself leave such a doubt, and that in determining such issues all of the pertinent evidence in the case, whether produced by the defendant or by the state, was to be considered, the defendant being entitled to the benefit of prosecution evidence, if it tended to benefit him, as well as to that adduced by himself. (See *People* v. *Wells* (1938), 10 Cal.2d 610, 621-623 [76 P.2d 493].)

A still more serious error appears in the instruction that "If the unlawful killing is done without the provocation and sudden passion *which reduces the offense to manslaughter,* or is done in the commission of an unlawful act, the natural consequences of which are dangerous to life, or is committed in the attempt to perpetrate a felony other than those mentioned in the description of murder in the first degree, or the circumstances of the killing show an abandoned heart, this is murder of the second degree, *unless the evidence proves the existence in the mind of the slayer of the specific intent to take life. If such specific intent exists at the time of such unlawful killing, the offense committed would of course be murder of the first degree.*" (Italics added.) Such instruction is egregiously erroneous. If the jury followed it they were bound to find, upon the facts of this case, that the homicide was murder of the *first* degree if it was murder at all.

The attorney general contends that "the presence of proof of specific intent distinguishes murder in the first degree from murder in the second degree. If the proof shows specific intent, it is murder in the first degree, and not murder in the second degree. Specific intent is deliberate intent" and that " 'Malice aforethought' is synonymous with 'deliberation and premeditation,' " citing *People* v. *Watts* (1926), 198 Cal. 776, 800-801 [247 P. 884]. Such contention cannot be sustained. (See *People* v. *Holt* (1944), *supra, ante,* pp. 59, 70, 87, 88.) To support it would belie any difference in the plain import of the words "specific" and "deliberate" and would emasculate the statutory difference between first and second degree murder. The word "specific" (adjective) means "Precisely formulated or restricted; . . . definite, . . . explicit; of an exact or particular nature" (Webster's New Int. Dict. (2d ed.)) while "deliberate" (as an adjective) means "formed, arrived at, or determined upon as a result of careful thought and weighing of considerations; as, a *deliberate* judgment or plan; carried on coolly and steadily, esp. according to a preconceived design; . . . Given to weighing facts and arguments with a view to a choice or decision; careful in considering the consequences of a step; . . . Slow in action; unhurried; . . . Characterized by reflection; dispassionate; not rash." (*Id.*) The verb "deliberate" means "to weigh in the mind; to consider the reasons for and against; to consider maturely; reflect upon; ponder; as, to *deliberate* a question . . . to weigh the arguments for and against a proposed

course of action." (*Id.*) It has been judicially declared that "Deliberation means careful consideration and examination of the reasons for and against a choice or measure." (*People* v. *Richards* (1905), 1 Cal.App. 566, 571 [82 P. 691].)

It is to be noted that the discussion by the attorney general omits any mention of the word "premeditated," which word is also used in the statute (Pen. Code, § 189), conjoined with "deliberate," to denote an essential element of murder of the first degree of the type here involved. The verb "premeditate" means "To think on, and revolve in the mind, beforehand; to contrive and design previously." (Webster's New Int. Dict. (2d ed.).)

It is true that in the case of *People* v. *Watts* (1926), *supra*, 198 Cal. 776, 800-801, this court, in discussing an averment in an information, said that "The words 'malice aforethought' are equivalent to an averment that the killing was committed with deliberation and premeditation"; also, in the case of *People* v. *Fowler* (1918), 178 Cal. 657, 661 [174 P. 892], it was said that "The statement in the information that the defendant did 'of his malice aforethought' kill and murder Duree is equivalent to an averment that the act was committed with deliberation and premeditation." Whatever is, or may have been, the rule as to sufficiency of pleading murder, it cannot be allowed to emasculate the statutory difference between the two degrees of murder or obviate the necessity for correctly and adequately instructing the jury as to the elements which must be proved.

Section 189 of the Penal Code defines the degrees of murder as follows: "All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, or mayhem, is murder of the first degree; and all other kinds of murders are of the second degree." In construing criminal statutes the *ejusdem generis* rule of construction is applied with stringency. (*Matter of La Societe Francaise etc.* (1899), 123 Cal. 525, 531 [56 P. 458, 787]; *People* v. *McKean* (1925), 76 Cal.App. 114, 121 [243 P. 898].) Hence, the more general words "or any other kind of willful, deliberate, and premeditated killing," following the specifically enumerated instances of killing which are expressly declared to constitute murder of the first degree,

must be construed in the light of such specifically listed types and be held to include only killings of the same general kind or character as those specifically mentioned. By conjoining the words "willful, deliberate, and premeditated" in its definition and limitation of the character of killings falling within murder of the first degree the Legislature apparently emphasized its intention to require as an element of such crime substantially more reflection than may be involved in the mere formation of a specific intent to kill.

Since the decision in *People* v. *Sanchez* (1864), 24 Cal. 17, 30, it has been repeatedly declared that "There need be no appreciable space of time between the intention to kill and the act of killing; they may be as instantaneous as successive thoughts of the mind," but this is not the equivalent of saying that the *intention to kill* can be formed without being preceded by deliberation and premeditation. It is only a declaration that the act of killing may instantaneously follow the intention once the latter is finally formulated. It does not imply that mature reflection (deliberation and premeditation) need not precede the ultimate formation of the evil intention. By its very language it has reference only to the "space of time between the intention to kill and the act of killing." In other words, a murder is of the first degree no matter how quickly the act of killing follows the ultimate formation of the intention if that intention has been reached with deliberation and premeditation. This view of the law is manifest in the Sanchez case by the statement (at p. 30 of 24 Cal.) that "The intent to kill must be the result of deliberate premeditation; it must be formed upon a pre-existing reflection, and not upon a sudden heat of passion sufficient to preclude the idea of deliberation." Neither the statute nor the court undertakes to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent which is truly deliberate and premeditated. The time would vary with different individuals and under differing circumstances. The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly, but the express requirement for a concurrence of deliberation and premeditation excludes from murder of the first degree those homicides (not specifically enumerated in the statute) which are the

result of mere unconsidered or rash impulse hastily executed. ██ The word "deliberate" is an antonym of "Hasty, impetuous, rash, impulsive" (Webster's New Int. Dict. (2d ed.)) and no act or intent can truly be said to be "premeditated" unless it has been the subject of actual deliberation or forethought (*id.*). ██ It is obvious that the phrases "malicious intent" and "malice aforethought" are not synonymous with "willful, deliberate, and premeditated" intent. (See *People* v. *Holt* (1944), *supra, ante,* pp. 59, 70.) Implications to the contrary in *People* v. *Watts* (1926), *supra,* 198 Cal. 776, 800-801, and *People* v. *Fowler* (1918), *supra,* 178 Cal. 657, 661, are disapproved. The instruction given was erroneous and under the circumstances of this case we cannot conclude that it was not prejudicial. (See *People* v. *Dail* (1943), *supra,* 22 Cal.2d 642, 650.)

██ It is contended on behalf of the state that the admonition that "If . . . you are convinced . . . that the defendant is guilty of the crime of murder . . . but still if you entertain a reasonable doubt whether the said killing was wilful, deliberate and premeditated, then in such case you cannot find the Defendant guilty of murder in the first degree" operates to cure the error in the preceding instruction that "If such specific intent [to take life] exists at the time of such unlawful killing, the offense committed would of course be murder of the first degree." But such contention has no merit. Since the effect of the last quoted instruction is to tell the jury that "wilful, deliberate and premeditated" intent means simply a specific intent to kill (as is contended by the attorney general to be the law) the jury, if consistent, would interpret the related doubt instruction as meaning merely that, as a basis for finding murder of the first degree, they must believe beyond a reasonable doubt that the killing was perpetrated with a *specific intent to kill.* If "specific intent" and "wilful, deliberate and premeditated intent" were synonymous, and if the jury had been instructed fully as to the meaning of "wilful, deliberate and premeditated," then the state's contention could be sustained, but since such expressions are not synonymous and inasmuch as the jury were not informed as to the meaning of "wilful, deliberate and premeditated," the error and the failure to cure it are obvious.

On behalf of the state great emphasis has been placed on certain language appearing in *People* v. *Leddy* (1928), 95

Cal.App. 659, 670 [273 P. 110]. An instruction similar to that which we are now considering had been given and on appeal it was assigned as one of many asserted errors. The District Court of Appeal in disposing of the point said (p. 671), "The court in its other instructions fully defines murder of the first and second degree, and manslaughter, *and the elements constituting those offenses.* Therefore, read in connection with the other instructions, the instruction complained of constituted a correct statement of the law. . . . [P. 680] We have gone over the entire record in the case and have considered each one of the points raised by appellant, and we find no prejudicial error." (Italics added.) We disapprove the declaration that "read in connection with the other instructions, the instruction complained of constituted a correct statement of the law." Obviously, "the instruction complained of," whether read in connection with the other instructions or otherwise, did not constitute a correct statement of the law.

The real effect of the holding of the District Court of Appeal in the Leddy case was that under all the circumstances of that case the giving of the instruction did not amount to prejudicial error. ▓▓▓ Here, upon an examination of the entire record, we are unable to hold that it was not prejudicial. (Cal. Const., art. VI, §4½; *People* v. *Burness* (1942), 53 Cal. App.2d 214, 222 [127 P.2d 623]; *People* v. *Dail* (1943), *supra,* 22 Cal.2d 642, 659.) As previously pointed out, *upon the undisputed facts in this case,* if the jury found the offense to be murder at all, they were bound, *if they followed that instruction* to find that it was murder of the first degree. There is no question raised as to the specific intent of the defendant; both his conduct and his admissions establish it. But the evidence is in substantial conflict and presents a close question as to whether that specific intent was formed with deliberation and premeditation or rashly and impetuously in the heat of sudden anger. We belie the admonitions of reality and assume too much too lightly if we undertake to hold as a matter of law that the jury did not gain the understanding from the quoted instruction, regardless of the other inconsistent instructions, that they *could not lawfully find the defendant guilty of second degree murder* if "the evidence proves the existence in the mind of the slayer of the specific intent to take life." The court solemnly told them, "If such specific

intent exists at the time of such unlawful killing, the offense committed would of course be murder of the first degree.'' It should be obvious that the vice in this instruction which principally motivates our conclusion that it was prejudicially erroneous comes not from any failure of the trial court to have correctly defined first degree murder elsewhere but rather from the fact that under this instruction, whether read with the others or alone, the jury, *if they gave this instruction any effect whatsoever, were by it substantially precluded from finding the offense to be murder of the second degree.* Yet on the evidence this was the closest and most critical issue in the case. On such a record we cannot hold that the jury gave no effect to the instruction.

 It is also to be observed that the instructions given cover quite fully the distinction between murder and manslaughter and advise the jury as to the meaning of the term ''provocation'' and its materiality in relation to possibly reducing the offense from murder to manslaughter but the instructions are wholly silent in respect to the materiality of provocation as regards the degree of murder, if the homicide is found to be murder. Provocation of a kind, to a degree, and under circumstances insufficient to fully negative or raise a reasonable doubt as to the idea of *both* premeditation *and* malice (thereby reducing the offense to manslaughter) might nevertheless be adequate to negative or raise a reasonable doubt as to the idea of premeditation or deliberation, leaving the homicide as murder of the second degree; i. e., an unlawful killing perpetrated with malice aforethought but without premeditation and deliberation.

 Murder of the second degree may be defined as the unlawful killing of a human being with malice aforethought but which killing is not perpetrated by means of poison, or lying in wait, or torture, is not wilful, deliberate *and* premeditated, and is not committed in the perpetration of or attempt to perpetrate arson, rape, robbery, burglary, or mayhem. (See Pen. Code, §§ 187, 189.) It is apparent from the facts previously recited that the homicide in this case, if it was murder at all, was murder of the second degree unless the killing was ''wilful, deliberate and premeditated.'' The existence of provocation and its extent and effect, if any, upon the mind of defendant in relation to premeditation and deliberation in forming the specific intent to kill, as well as in regard to

the existence of malice (Pen. Code, § 188), constitute questions of fact for the jury and they should have been so advised.

It will be observed that the errors hereinabove discussed all relate solely to the question of the degree of the murder (with the possible exception of one aspect of the reading of section 1105 of the Penal Code) and defendant has contended that we should reduce the judgment from murder of the first degree to that of the second. This latter contention, however, is based, necessarily, not upon the errors mentioned but upon the proposition that there is a doubt as to whether the evidence is sufficient to support the adjudication that the murder is of the first degree, citing *People* v. *Howard* (1930), *supra,* 211 Cal. 322, 330, wherein this court said, "We entertain a doubt as to its [the record] showing murder of the first degree" and reduced the judgment to murder of the second degree. Defendant urges that the rule is "that the judgment must be reduced *when there is a doubt* as to the sufficiency of the evidence to support the higher crime" and that "the doubt which justifies the reduction is the court's doubt and furthermore it is the doubt of *the particular court passing upon the question.*" (Italics added.) This view of the law would require courts of appellate jurisdiction in all cases involving crimes divided into degrees or including lower offenses, where the defendant was convicted of any other than the lowest possible class or degree, to examine and pass upon the *weight* of all the evidence in the record. We are satisfied that the trial court (with or without a jury), as the original trier of facts, having the witnesses before it and possessing facilities peculiarly appropriate and convenient to the ascertainment of facts, is in a better position than are we to pass upon the weight of evidence, and that the Legislature in amending subdivision 6 of section 1181 of the Penal Code to provide that "When the verdict is contrary to law or evidence, but if the evidence shows the defendant to be not guilty of the degree of the crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the judgment accordingly without granting or ordering a new trial, and this power shall extend to any court to which the cause may be appealed," did not intend to effect a general alteration of the rule as to the respective functions of trial and appellate courts. While the *power* granted to the appellate court is equal to that given the trial court the circumstances which will justify its exercise in a particular

court are those which are appropriate to typical functioning of that court. ▮ In other words, upon an application to reduce the degree or class of an offense, a trial judge may review the *weight* of the evidence but an appellate court should consider only its *sufficiency as a matter of law*. This is in accord with the general rule stated in *People* v. *Holt* (1944), *supra, ante,* pp. 59, 70: "The function of the jury was to appraise the weight of the evidence; ours is to appraise its legal adequacy" and (p. 90) "While the jury is given the function of determining the facts upon the evidence it does not have the power of changing the standard [as to what constitutes murder of the first degree as distinguished from murder of the second degree]." Implications to the contrary in *People* v. *Howard* (1930), *supra,* 211 Cal. 322, 330, are disapproved. ▮ Having examined the record in this case we do not feel constrained to hold that the evidence is legally inadequate to support a verdict of murder of the first degree. Hence, we are not authorized to reduce the judgment under our view of section 1181(6) of the Penal Code.

Other errors complained of arise from situations and events which need not occur on a new trial and therefore, in the light of the conclusion we have reached, need not be discussed.

For the reasons hereinabove stated the judgment and order appealed from are reversed.

Gibson, C. J., Carter, J., and Traynor, J., concurred.

EDMONDS, J.—As I read the record in this case, it not only shows evidence which, as conceded by my associates, substantially supports the verdict of the jury finding Thomas guilty of murder of the first degree but also a charge to the jury which includes a complete and accurate statement of the law relating to the crimes of murder and manslaughter. I therefore cannot concur in the decision granting the appellant a new trial. And assuming that the abstruse and meticulous analysis of the instructions made by Justice Schauer justifies the conclusion that there was error in the charge to the jury, in my opinion, considering all of the facts of the case, the verdict should be upheld in accordance with the constitutional mandate requiring that a judgment shall not be reversed because of the jury's misdirection, "unless, after an examination of the entire cause, including the evidence, the

court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 4½.)

The evidence relating to the homicide, including the statements of Thomas concerning the circumstances surrounding its commission, provides ample basis for characterizing the crime as a planned and deliberate murder which the jury correctly determined to be of the first degree. For some time, Thomas had suspected that Bernice was engaged in clandestine relations with other men. Whether this mistrust was warranted or wholly unfounded, both at the time of his arrest, immediately following the shooting, and shortly thereafter he voluntarily stated that because of his suspicions he had "planned to do this before."

As he related the occurrences, on the night of the shooting he left Bernice in bed and pretended to go to work but instead "laid in wait to catch her." When he secretly returned to his home and found Bernice dressing to go out, he said "I just got mad and grabbed my pistol." Bernice then "broke and run on out and I ran after her and shot her." It appears that, in her efforts to escape Thomas, Bernice reached a point about 60 feet from the porch of their home and when he caught up to her there, she doubled back and ran in the opposite direction for a somewhat greater distance before he felled her with the fatal shots. Thomas admitted that he fired four times and his testimony was corroborated by the autopsy surgeon who found eight puncture wounds in the body of Bernice. These were the points of entrance and exit of the four bullets.

Later, on the witness stand, in an apparent attempt to minimize the legal consequences of his act, Thomas altered his story in several material particulars. He then said that he missed the bus for work on the night of the shooting and unexpectedly returned home to find Bernice preparing to go out with another man, that a dispute followed, and that in the resulting tussle the gun was accidentally discharged with fatal effect.

Unquestionably the jury was fully justified in rejecting the appellant's courtroom version of the shooting in the face of his earlier contradictory and impeaching statements. Moreover, it is inconceivable that the gun could have "accidentally" discharged four times into the body of Bernice. And in addition to the self-impeaching statements of Thomas, the

testimony of other witnesses absolutely discredits the story related by him upon the witness stand.

According to Mrs. Banks, Bernice was dressing to visit her sister when Thomas entered the room. He was very angry and "grabbed" his loaded pistol from a dresser drawer. Bernice called out "Mama, come quick, and don't let C. T. kill me." As he held Bernice in one arm, Thomas told her mother to get back or he would give her "the same." He then shoved Bernice out of the door and down a flight of steps. She broke loose and ran down the street, Thomas pursuing her. He fired two shots at her and later three more. A neighbor, who was passing the house at the time of the "confusion," heard Bernice cry out, "Please don't kill me, I haven't done anything." Later, this witness said, Bernice ran down the street with Thomas in pursuit and as they entered a darkened area he heard her cry out several times, "Please don't kill me, C. T., I haven't done anything." He then heard several shots and a few seconds later he heard additional shots.

This evidence overwhelmingly supports the jury's verdict that the murder was premeditated and therefore of the first degree. The appraisal of the evidence and the resolving of conflicts therein including the weighing of the inconsistent and impeaching versions of the circumstances surrounding the homicide given by Thomas were matters exclusively for the jury's determination. In explaining and minimizing the scope and effect of his statements indicative of premeditation, my associates have effectively usurped the function of the jury.

Concerning the instructions, the majority admit that they were correct in concept and adequate in expression of the distinction between murder and manslaughter. But, it is said, they did not adequately and accurately inform the jury in regard to the distinction between murder of the first degree and murder of the second degree. In reaching this conclusion, Mr. Justice Schauer declares that the brief of the attorney general misconceives the distinction between the degrees of murder and that it erroneously stresses the necessity for the presence, in a homicide of the type here involved, of only a specific intent to kill without mentioning the equally essential element of premeditation. It is somewhat unusual, to say the least, for a judicial conclusion to be based upon the assertedly incorrect statements of counsel in regard to the law.

Considering the instructions as the basis of the charge that the jury was misdirected, I do not find any error in them; on the contrary they clearly define the crimes of murder of the first degree and murder of the second degree, accurately stating the difference between the two offenses.

"Murder," the court told the jury in the exact language of the Penal Code, "is the unlawful killing of a human being, with malice aforethought. [Pen. Code, § 187.] Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart. [Pen. Code, § 188.] All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, or mayhem, is murder of the first degree; and all other kinds of murders are of the second degree." (Pen. Code, § 189.)

By these instructions the jury was told that to convict one of the crime of murder of the first degree, the evidence must show premeditation. But the court gave a much fuller explanation of the subject, saying: "In dividing murder into degrees the legislature intended to assign to the first as deserving of greater punishment, all murders of a cruel and aggravated character, and to the second all other kinds of murder which are murder at common law, and to establish a test by which the degree of every case of murder may be readily ascertained. That test may be thus stated: *Is the killing willful* (that is to say, intentional), *deliberate and premeditated? If it is, the case falls within the first degree and if not, within the second degree.* There are certain kinds of murder which carry with them conclusive evidence of premeditation; these the Legislature has enumerated in the code definition already given you and has taken upon itself the responsibility of saying that they shall be deemed and held to be murder of the first degree. These cases are of two classes:

"First: Where the killing is perpetrated by means of poison, lying in wait, torture, etc. Here the means used is held to be conclusive evidence of premeditation.

"Second: Where the killing is done in the perpetration, or attempt to perpetrate, some one of the felonies enumer-

ated in the statute, such as arson, rape, robbery, burglary or mayhem, here the occasion is made conclusive evidence of premeditation. Where the case comes within either of these classes the test question: Is the killing willful, deliberate and premeditated? is answered by the statute itself, and the jury have no option but to find the prisoner guilty in the first degree. Hence so far as these two classes are concerned, all difficulty as to the question of degree is removed by the statute. But there is another and much larger class of cases included in the definition of murder in the first degree, which are of equal cruelty and aggravation with those enumerated, and which, owing to the different and countless forms which murder assumes, it is impossible to describe in the statute. In this class the legislature leaves the jury to determine from all the evidence before them, the degree of the crime, but prescribes for the government of their deliberations the same test which has been used by itself in determining the degree of the other two classes, to-wit: *The deliberate and preconceived intent to kill.* It is only in the latter class of cases that any difficulty is experienced in drawing the distinction between murder of the first and murder of the second degree, and this difficulty is more apparent than real. The unlawful killing must be accompanied with a deliberate and clear intent to take life in order to constitute murder of the first degree. *The intent to kill must be the result of deliberate premeditation. It must be formed upon a pre-existing reflection* and not upon a sudden heat of passion sufficient to preclude the idea of deliberation.

"There need be, however, no appreciable space of time between the intention to kill and the act of killing—they may be as instantaneous as successive thoughts of the mind. *It is only necessary that the act of killing be preceded by and the result of a concurrence of will, deliberation and premeditation on the part of the slayer, and if such is the case the killing is murder in the first degree,* no matter how rapidly these acts of the mind may succeed each other, or how quickly they may be followed by the act of killing." (Italics added.)

This instruction is taken directly from *People* v. *Sanchez,* 24 Cal. 17, 29-30, which is relied upon by my associates in the present case and also characterized by them in *People* v. *Holt, ante,* pp. 59, 87 [153 P.2d 21], as the first decision in this state to correctly point out the distinction between murder of the first and of the second degree. Certainly the

instruction informed the jury no less than four times as to the necessity, under the legislative definition, for reflection or premeditation in order that a homicide may be classified as murder of the first degree.

My associates also place their conclusion that the judgment should be reversed upon the ground that another instruction destroyed the distinction between first and second degree murder, so painstakingly expressed by the trial court in its charge. The criticized instruction in this regard reads: "If the unlawful killing is done without the provocation and sudden passion which reduces the offense to manslaughter, or is done in the commission of an unlawful act, the natural consequences of which are dangerous to life, or is committed in the attempt to perpetrate a felony other than those mentioned in the description of murder in the first degree, or the circumstances of the killing show an abandoned heart, this is murder of the second degree, *unless the evidence proves the existence in the mind of the slayer of the specific intent to take life. If such specific intent exists at the time of such unlawful killing, the offense committed would of course be murder of the first degree.*" (Italics added.)

In determining that the italicized portion of the instruction is erroneous, my associates have not considered its context. Of particular importance are the emphasized words "existence" and "exists." As there used, and when read in light of the immediately preceding and immediately subsequent instructions, which clearly informed the jury as to the necessity for deliberation and premeditation in murder of the first degree, these two words necessarily connote or imply a preconceived or premeditated intent to take life. And, of course, when such preconceived and premeditated intent to take life "exists" in the mind of the slayer, the resulting homicide is murder of the first degree.

The immediately preceding instruction informed the jury, no less than four times, that premeditation was a necessary element of murder of the first degree. The instruction following re-emphasized the point by informing the jury, "If under the evidence herein you are convinced to a moral certainty and beyond a reasonable doubt that the defendant is guilty of the crime of murder, that is to say, that he unlawfully killed said Bernice Thomas, also known as Bernice Owsley, with malice aforethought, but still if you entertain a reasonable doubt whether the said killing was wilful, deliberate and

premeditated, then in such case you cannot find the defendant guilty of murder in the first degree.''

I am satisfied, therefore, that the instruction which my associates classify as prejudicially erroneous is not open to criticism when correctly construed and read in the light of the remainder of the charge to the jury. (*People* v. *Leddy,* 95 Cal.App. 659, 670, 671 [273 P. 110].) The same instruction was challenged in the Leddy case upon the ground advanced by Thomas, but it was held (and this court denied a hearing) that when read in connection with the other instructions to the jury defining murder of the first and of the second degree and of manslaughter, it correctly stated the law. That conclusion was based upon the following reasoning: ''It is claimed that this instruction is erroneous because it tells the jury that if there existed in the mind of appellant a specific intent to take life it constituted murder of the first degree and that the instruction ignores the necessary elements of premeditation and deliberation which are necessary elements of murder of the first degree. It will be noted that the instruction states that if the unlawful killing is done without the provocation and sudden passion, which reduces the offense to manslaughter, or is done in the commission of an unlawful act, the natural consequences of which are dangerous to life, or is committed in the attempt to perpetrate a felony other than those mentioned in murder of the first degree, or the circumstances of the killing show an abandoned heart, that is murder of the second degree. The court in its other instructions fully defines murder of the first and second degree, and manslaughter, and the elements constituting those offenses. Therefore, read in connection with the other instructions, the instruction complained of constituted a correct statement of the law.''

But, assuming that the criticized instruction is incomplete in its statement of the essentials of murder of the first degree, it is inconceivable that the jury could have been thereby confused or misled in its deliberations when, as shown, it had been told in many other instructions that ''the unlawful killing must be accompanied with a deliberate and clear intent to take life in order to constitute murder of the first degree. The intent to kill must be the result of deliberate premeditation. It must be formed upon a pre-existing reflection. . . .''

Also, my associates give no effect to other instructions by which the jury repeatedly was told that premeditation is an

essential element of the crime of murder of the first degree. Moreover, an instruction admonishing the jury to "consider these instructions as a whole [as required by settled law] and not any one instruction to the exclusion of another," is completely ignored. Under these circumstances and particularly considering the evidence consisting of Thomas' own statements and the physical facts which point convincingly to a murder of the first degree, the record presents a case calling for the application of the curative provisions of section 4½ of article VI of the Constitution.

The reversal is also grounded upon the asserted error in an instruction which is not challenged by the appellant. This instruction is phrased in the exact language of section 1105 of the Penal Code and many times has received judicial approval. (*People* v. *Boggs,* 12 Cal.2d 27, 35 [82 P.2d 368]; *People* v. *Madison,* 3 Cal.2d 668, 676-677, [46 P.2d 159]; *People* v. *Grill,* 151 Cal. 592, 595 [91 P. 515]; *People* v. *McClure,* 148 Cal. 418, 421 [83 P. 437]; *People* v. *Leddy,* 95 Cal.App. 659, 672 [273 P. 110]; *People* v. *Richards,* 1 Cal.App. 566, 571 [82 P. 691].) The criticism directed at that instruction in the concurring opinion of Mr. Justice Traynor in *People* v. *Albertson,* 23 Cal.2d 550, 586-588 [145 P.2d 7], is a statement of his views only. The cases of *People* v. *Post,* 208 Cal. 433 [281 P. 618], *People* v. *Bushton,* 80 Cal. 160 [22 P. 127, 549], and *People* v. *Elliott,* 80 Cal. 296 [22 P. 207], which were cited by him involved a different instruction which did not follow the language of Penal Code section 1105. Among other things, the instruction in those cases contained the following: "That is, the killing being proved, the defendant must make out his case in mitigation to excuse or justify by some proof stronger in some appreciable degree than the proof of the prosecution. The burden of proof changes. It must be in some degree, no matter how small, stronger than the proof of the prosecution on the other side." In other words, the challenged instruction required proof of mitigating circumstances by a preponderance of the evidence. (See criticism of this language in *People* v. *Post, supra,* 437, and in *People* v. *Madison,* 3 Cal.2d 668, 676-677 [46 P.2d 159].)

The instruction in the present case is not open to this objection. Moreover, the jury which found Thomas guilty was clearly instructed that a defendant is presumed innocent "and, in order to convict him of the crime alleged . . . or of any lesser crime which may be included in it, every material

fact necessary to constitute such crime must be proved beyond a reasonable doubt and, if you entertain a reasonable doubt upon any single fact or element necessary to constitute the crime, it is your duty to give the defendant the benefit of such doubt and acquit him.'' Additionally, the jury was charged that if it believed ''from all the evidence in the case beyond a reasonable doubt that the defendant is guilty of homicide, but have a doubt as to the degree of the offense of which the defendant is guilty—whether it is murder in the first degree, murder in the second degree, or manslaughter, the jury will give the defendant the benefit of such doubt and find him guilty only of the lowest offense as to which they may find him guilty beyond a reasonable doubt.''

For these reasons, in my opinion, the judgment should be affirmed.

Shenk, J., concurred.