[Crim. No. 5038. In Bank. Apr. 19, 1950.]

THE PEOPLE, Respondent, v. HENRY HOOPER, Appellant.

Frank Loria for Appellant.

Fred N. Howser, Attorney General, and Doris H. Maier, Deputy Attorney General, for Respondent.

SCHAUER, J.—Defendant Henry Hooper pleaded guilty to the charge of murdering Mrs. Lilly Calvert. The trial court determined that the murder was of the first degree (see Pen. Code, § 1192) and specified death as the punishment (see Pen. Code, § 190). On this automatic appeal from the judgment we have concluded that no ground for reversal or modification appears.

Defendant's principal contention is that there is insufficient evidence of deliberation and premeditation (the only theory upon which the murder could be of the first degree). Defendant himself did not take the stand and the only evidence on this crucial question is the following testimony as to his behavior:

Defendant and Mrs. Calvert had known one another for at least two months (the precise length of time does not appear) preceding the killing. He had been a frequent visitor at her home. Mrs. Calvert lived with her two sons, Hurley, aged 14, and Bobby, who was younger. Mrs. Calvert once said that she and defendant planned to marry; later on she told defendant that she did not want to see him again because she objected to his excessive drinking.

About 5:30 p. m. on February 10, 1949, the day of the killing, Mrs. Calvert had a telephone conversation with defendant, in the course of which she told him not to come to her house. What defendant said to her in this conversation does not appear. Mrs. Calvert at once telephoned the police; this call was made at 5:42 p. m. There is no evidence of what she reported, but an officer was sent to her home "to investigate." Before the officer arrived defendant came to the Calvert home and, without knocking or requesting admission, forced open the screen door, which was hooked, and the wooden door, which was secured with a bolt latch; these doors led into the kitchen. Defendant said, "I just want to show

you my check." Mrs. Calvert replied, "I don't want to see the check." The police officer who had been sent to the Calvert home then arrived. Mrs. Calvert pointed out the door fastenings which defendant had broken and told the officer that "she didn't want to have charges made against him; she said she would like to be as nice to him as she could, but he wouldn't leave her alone . . . She said, 'All I want Henry to do is leave my house.' . . . [Defendant] said, 'O.K., I will leave, I will leave with the policeman.' " The officer "told him not to come back to the house any more" and the two men left together.

At about 6 p. m. defendant again came to the door. Mrs. Calvert, Bobby, Hurley and a neighbor, Mrs. Mary Perry, were present. Defendant knocked and Bobby admitted him. Mrs. Perry described defendant's second visit as follows: Defendant walked toward Mrs. Calvert; "I stepped between, I thought if he did anything to her I would try to keep him from hurting her . . . [H]e kind of was crying and talking [and] he says 'you mistreat me, you mistreat me, you and Mrs. Perry you mistreat me,' and I says 'no, Henry, I don't do anything to you' and he kept on, he was just like he was crazy or something, he kept coming and when he got to her he caught both of us and grabbed both of us just like that (indicating), like somebody going crazy; I says 'I haven't done anything Henry, I wouldn't do anything to you . . .' " Mrs. Calvert said to defendant, "I want you to stay away from my house . . . Henry, go on. You pack a gun, you are crazy. I am so nervous I don't know what to do." Defendant replied, "This is not your house, you can't demand me to stay out of this house because it is none of yours." (Mrs. Calvert rented the house from Mrs. Perry.) Mrs. Perry said, "True enough the place belongs to me, . . . but Mrs. Calvert has the house rented. But if that's the way you feel about it tonight, I demand that you go off the property and don't come back any more." After further urging by Mrs. Perry defendant left. She walked with him to the alley. He said, "Mrs. Perry, I will promise you I won't put my foot back on this place again," and went down the alley. Mrs. Perry returned to the Calvert home. She repaired the damaged door fastenings and told the children not to admit defendant if he returned. In about 15 minutes defendant again knocked at the kitchen door and identified himself. Mrs. Perry said, "Henry, you promised me you weren't going to come back on the property no more. Now, what do you want now?" Defendant replied,

"I want my radio." (Defendant had lent the radio to Mrs. Calvert and, according to Bobby, "always would take it and bring it back.") Both Mrs. Perry and Mrs. Calvert said, "The law will give you the radio tomorrow" and urged defendant to leave. Defendant again broke open the screen door. He battered down a panel of the wooden door, saying nothing, while Mrs. Perry was "pleading with him not to tear the door open." Defendant pointed a shotgun through the broken panel at Mrs. Calvert. The two boys seized the barrel of the gun and urged him not to shoot. They were unable to deflect the barrel and defendant shot Mrs. Calvert as she went from the kitchen into the living room. Hurley telephoned the police. (This call was received at 6:45 p.m.) Meanwhile defendant went around the house and again shot Mrs. Calvert; this second shot was fired through a living room window.

When and where defendant obtained the shotgun does not appear. Three neighbors of Mrs. Calvert testified that shortly before the shooting defendant had gone to their respective homes and unsuccessfully attempted to borrow a gun; defendant represented to one of these men that he planned to go hunting; to another he said that he wanted a gun because "he had a little beef across the street." After killing Mrs. Calvert defendant disappeared for nine days, eluding a police dragnet, then voluntarily surrendered.

It was for the trier of fact to decide, from the above evidence, whether defendant's behavior was the result of rash, hastily conceived impulse or of cool, fixed purpose. The fact that he appeared to Mrs. Perry to act "like somebody going crazy" when, for no apparent reason, he wept and accused her and Mrs. Calvert of mistreating him, does not, as defendant contends, necessarily show that he was incapable of premeditated thought and deliberate action. Although the record does not clearly disclose a reason for defendant's behavior, it does disclose a course of conduct commencing with harassment of Mrs. Calvert, persisted in, and growing in violence until it culminated in her murder. Defendant continued his efforts to obtain a gun until he did so, despite the fact that at least three of his attempts were unsuccessful. He returned armed to the Calvert home although he had repeatedly been ordered and requested to stay away and had twice agreed to do so. His statement, on his third visit of the evening, that he wanted his radio appears to have been only a pretext to gain entry to the house. When he was refused admittance he broke open the doors. He persisted in his effort to shoot Mrs. Calvert

despite the protests and physical resistance of her children. Having shot her once he did not cease his murderous behavior; as she went through the house he went around it and shot her again. Upon this record we cannot say that the trial court's determination lacks evidentiary support.

■ Defendant contends that the trial court erred in failing to designate the type of first degree murder of which it found defendant guilty. Nothing in the law, under the circumstances of this case, requires such a specific finding. The only type of first degree murder which the evidence tends to show, is wilful, deliberate and premeditated murder by means other than poison, torture or lying in wait. Since defendant's brief is based on the assumption that this is the type of first degree murder of which he was convicted it is not true, as he asserts, that he has been ''materially'' or at all prejudiced by the trial court's failure expressly to designate the type of murder.

■ Defendant points out that the trial court referred to the hearing as one ''in mitigation of punishment'' and urges that this characterization of the hearing shows that the court mistakenly believed that defendant had the burden of showing mitigating circumstances to reduce the murder from first to second degree, contrary to such cases as *People* v. *Thomas* (1945), 25 Cal.2d 880, 896 [156 P.2d 7]. The record, however, does not establish that the trial judge had any such misconception as to the burden of showing deliberation and premeditation; he referred to the hearing as one ''in mitigation of punishment [and] for *determination* of the degree.'' (Italics added.) We cannot assume that his reference to ''mitigation of *punishment*'' indicated misapprehension as to the law concerning burden of proof of the *degree* of the offense. Rather, there being nothing in the record establishing the contrary, we must assume in favor of upholding the judgment that the court performed its duties in accord with the applicable law as stated in *People* v. *Gilbert* (1943), 22 Cal.2d 522, 528 [140 P.2d 9] : ''In determining the degree of an offense and the punishment to be imposed, after a plea of guilty, it is the duty of the trial court to consider matters in aggravation as well as in mitigation of the offense . . .''

For the reasons above stated, the judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Spence, J., concurred.