Filed 5/20/24  P. v. Uriostegui CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>DANIEL URIOSTEGUI,<br><br>  Defendant and Appellant. | F086305<br><br>(Super. Ct. No. CRM005365A)<br><br>**OPINION** |

## THE COURT*

APPEAL from an order of the Superior Court of Merced County.  John D. Kirihara.  (Retired Judge of the Merced County Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

William G. Holzer, under appointment by the Court of Appeal, for Defendant and Appellant.

The Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

\*       Before Hill, P. J., Poochigian, J. and Detjen, J.

## INTRODUCTION

In 2010, appellant and defendant Daniel Uriostegui (defendant) was convicted of premeditated attempted murder and sentenced to the second strike term of 30 years to life. In 2023, the trial court denied defendant's Penal Code[1] section 1172.6 petition and found he failed to make a prima facie case for resentencing.

On appeal, appellate counsel filed a brief which summarized the facts and procedural history with citations to the record, raised no issues, and asked this court to independently review the record pursuant to *People v. Delgadillo* (2022) 14 Cal.5th 216. Defendant submitted a supplemental brief. We address his contentions and affirm the trial court's denial of his petition.

## FACTS[2]

"Around 4:30 a.m. on June 19, 2009, [Merced Police Officer] Walker was off duty and following his normal routine of driving to the gym in his truck. He used his regular route and drove on Park Avenue in Merced. His driver's door window was rolled down. It was still dark, and the truck's headlights were on.

---

[1]     All further statutory citations are to the Penal Code.

[2]     After notice to the parties, and without objection, this court takes judicial notice of the record from defendant's direct appeal in *People v. Uriostegui* (Dec. 19, 2011, F060232) [nonpub. opn.] (*Uriostegui*). The following facts are from the nonpublished opinion in that case, which is part of the instant record on appeal.

In reviewing a section 1172.6 petition, the trial court may rely on "the procedural history of the case recited in any prior appellate opinion." (§ 1172.6, subd. (d)(3); *People v. Clements* (2022) 75 Cal.App.5th 276, 292; *People v. Cooper* (2022) 77 Cal.App.5th 393, 400, fn. 9.) The role of the appellate opinion is limited, however, and the court may not rely on factual summaries contained in prior appellate decisions or engage in fact finding at the prima facie stage. (*Clements*, at p. 292; *People v. Lewis* (2021) 11 Cal.5th 952, 972 (*Lewis*).) We have quoted the factual statement from defendant's direct appeal to place his current arguments in context, and do not rely on that factual statement to resolve his appeal from the trial court's order that found his petition did not state a prima facie case for relief.

2.

"As Walker continued on Park Avenue, he approached an alley which crossed the street, but there was no stop sign or crosswalk in the intersection. Walker saw two males walk out of the alley on his left side. The two men were walking together in the alley at a fairly quick pace, and they headed toward Park Avenue.

"When the two men reached Park Avenue, they slowed down and one man stopped on the sidewalk, about 20 to 25 feet from the left side of Walker's truck.[3] Walker later identified this man as codefendant [Martin] Olvera.

"Walker slowed down his truck because he was not sure if the men were going to walk into the street. Olvera remained on the sidewalk but the second man walked into the street in a slower gait. Walker later identified the second man as defendant. Walker testified defendant walked into the street at an angle, and 'purposely' stopped in front of the right headlight of his truck.

"Walker immediately stopped his truck to avoid hitting defendant. Defendant remained in the street about three feet away from the front right side of his truck. Olvera was still standing on the sidewalk on Walker's left side, and called out to Walker, ' "Hey, do you have a cigarette?" ' Walker replied no, that he didn't smoke. Walker testified that Olvera called out to him within two seconds of the time that defendant stopped in front of his truck. Defendant remained in front of Walker's truck during this brief exchange.

"Walker testified that immediately after he responded to Olvera, defendant turned 'completely back almost 180 degrees,' and 'over to his right shoulder and made a kind of heads up, kind of a nodding affirmation' to Olvera, who was still standing on the sidewalk, directly across from Walker's open driver's door window. Defendant 'turned over his shoulder towards my truck and kind of did the head up … his eyebrows even kind of raised up like a signal.' Defendant did not nod up and down, but 'kind of lifted his head up … using his head and eye movement.'

---

**3**     "At trial, Walker admitted that he made a previous statement that the man on the sidewalk was about 25 to 30 yards from the left side of his truck."

3.

"Walker believed defendant was giving a signal to the man on the sidewalk. Walker testified defendant's motions caused him 'great concern' and 'alarm.' Walker thought he was being 'set up for an attack' based on the manner that defendant forced him to stop the truck and then signaled to the other man.[4] Walker did not recognize either man, and he did not know whether they were trying to 'kill me to get my truck or just kill me because they recognized me' as an officer.

"Walker quickly looked to his left. Olvera was still standing on the sidewalk, and Walker did not see him with any weapon. Defendant remained in the street in front of the right side of Walker's truck. Walker turned his steering wheel to the left and attempted to accelerate around defendant because he believed he was in a dangerous situation.

"Just as Walker started to accelerate, he heard and felt the vibration of a bullet hit the driver's door of his truck, directly below the open driver's door window. Defendant was still standing about three feet in front of the truck when the first shot was fired at the driver's door. Walker did not see a gun flash or the person who fired at him.

"Walker ducked down on the driver's seat, turned the steering wheel to the left to avoid hitting defendant, and accelerated out of the area. As he drove away, he heard three or four more gunshots. He tried to look back through his left-side mirror, but it had been shattered.

"Walker reached a point of safety and realized he was not wounded. He called 911 and reported the incident, and then turned around and headed back to the area to look for the suspects. He was carrying a firearm and drove around the area, but he could not find anyone."

---

**4** "[D]efense counsel objected to Walker's interpretation and opinions about the meaning of defendant's motions, and the court overruled those objections and permitted Walker's testimony on these points."

4.

## The Initial Investigation

"Just minutes after the shooting, numerous officers responded to the scene and set up a perimeter in the area. Walker advised the responding officers that the two suspects were young Hispanic males. Walker said the man who stopped in front of his truck was wearing a Raiders black or grey jersey and black and white plaid shorts. The man who stayed on the sidewalk was wearing a white T–Shirt and dark-colored short pants.

"It was later determined that a gunshot hit the driver's door of Walker's truck, just above the door handle and below the open window. The rear view mirror on the driver's door was shattered. Another bullet hit the left side window of the truck's rear camper shell, continued inside the camper shell, and hit the truck's cab directly behind the driver's seat. A third bullet entered the middle section of the camper shell's rear hatch window."

## Apprehension of the Suspect

"Shortly after responding to the scene, Officer DeJong and Sergeant Dash saw an individual in the perimeter area who fit the clothing description of one of the suspects. This individual, later identified as defendant, was near an apartment building in the 3000 block of Park Avenue. DeJong and Dash attempted to speak to defendant, but he refused to stop and ran away. DeJong and other officers chased defendant through the neighborhood.

"Officer Padgett was heading toward the pursuit of the suspect when he came upon another person, later identified as codefendant Olvera, who was near the swimming pool of the same apartment building on Park Avenue. Olvera was walking away and kept looking back. Padgett ordered Olvera to stop, and Olvera obeyed his order. Olvera smelled of alcohol, but he was extremely calm, friendly, and cooperative. Olvera was wearing baggie pants and a Raiders jersey, but the jersey's colors did not match Walker's clothing description. He did not have a firearm.

5.

"Officer Padgett detained Olvera and escorted him to a police car. Olvera repeatedly asked why he was being detained. Padgett replied that he believed Olvera was involved in a shooting which had just occurred, and an officer was the intended victim. Olvera's demeanor changed, and he became defensive and said he did not know anything about a shooting.

"In the meantime, DeJong and the other officers continued to chase defendant, who ignored their repeated orders to stop running. Defendant jumped neighborhood fences as he attempted to escape. The officers tried to use their 'Tasers' to stop defendant, but they were unable to hit him. Officer Padgett, who had rejoined the pursuit, was able to deploy his Taser and defendant fell down. Defendant was taken into custody, and he did not have a firearm."

**Field Identifications**

"About 15 to 20 minutes after the shooting, officers asked Walker to look at defendant in the field. Walker immediately identified defendant as the person who stopped in front of his truck.

"About 30 to 40 minutes after the shooting, Walker was asked to look at Olvera. Walker thought Olvera looked similar to the suspect who stood on the sidewalk, but Olvera's clothes were not the same as that suspect. Walker asked Olvera to say something, Olvera complied, and Walker immediately recognized Olvera's voice as belonging to the suspect who asked him for a cigarette. The officers discovered that Olvera was wearing a white T–Shirt and dark-colored short pants under his baggie outer clothing."

**The Apartment Complex**

"Defendant and Olvera were apprehended in the vicinity of an apartment complex located in the 3000 block of Park Avenue. [C.V.] lived in one of the apartments in that complex with her boyfriend, [O.D.], and their young child.

6.

"[K.V.] lived next to [C.V.] on the second floor, and reported that [C.V.] had a large and noisy party which began on the evening of June 18, 2009, and continued into the early morning hours of June 19, 2009. [K.V.] watched the intoxicated party guests through her window and repeatedly asked [C.V.] to take control of the situation. At one point, a fight broke out between the intoxicated guests. [K.V.] never saw [C.V.'s] boyfriend that night.

"Sometime around 4:00 a.m., [K.V.] saw three young Hispanic males leave [C.V.'s] party; one male was so drunk that he staggered out. They were wearing white tank tops and jeans. The three men stopped on the staircase landing, and two of them continued downstairs and headed toward Park Avenue.

"At trial, [K.V.] identified defendant as the man who was so intoxicated that he was staggering down the stairs. Defendant appeared so drunk that he lurched forward, as if he was going to fall, and the other man grabbed his arm and helped him down the stairs. [K.V.] also recognized defendant as someone who had previously visited [C.V.'s] apartment.

"[K.V.] testified that soon after the men left the party, she heard five gunshots fired in rapid succession. Within a minute, [K.V.] heard something like 'a herd' [of] people running up the stairs and into [C.V.'s] apartment, where the party was still going on. The door slammed, the music was turned off, and 'you could hear a pin drop it got so quiet.' [K.V.] heard someone dragging or moving something heavy across the floor. She heard someone jump on the chain link fence at the back of the apartment complex, and then heard an officer tell someone to stop."

**Search of C.V.'s Apartment**

"A few hours after the shooting, the SWAT team and other officers searched [C.V.'s] apartment pursuant to a warrant. The officers discovered a ladder in a bedroom closet, and the ladder led to an existing opening in the attic's crawl space. A .38-caliber

revolver was found in the crawl space. The weapon contained six expended shell casings.

"The revolver was later tested for DNA evidence, and it was determined that Olvera could not have contributed to the DNA found on the firearm. A criminalist explained that DNA could have been wiped off the weapon. Olvera's hands were tested for gunshot residue and the tests were negative."[5]

### C.V.'s Testimony

"[C.V.] testified as a prosecution witness. At the time of trial, she was in custody for failing to appear on a subpoena, and she also faced assault charges in an unrelated case. [C.V.] had been living in her apartment with [O.D.], who was a gang member, but they had split up and she was planning to leave the apartment. [C.V.] admitted she socialized with members of the Norteno gang.

"[C.V.] testified about the party at her apartment, and said her guests included [J.L.], [R.M.], and [G.O.] (codefendant Olvera's brother), who were members of the Norteno gang. Everyone was drinking and became intoxicated.

"[C.V.] testified that defendant, codefendant Olvera, and a third man arrived at the party around 1:00 a.m. or 2:00 a.m. She did not really know them. They were there for a few hours. At one point during the party, the three men went into her daughter's bedroom and closed the door. [C.V.] was angry and told them to get out of the bedroom. Defendant, Olvera, and the third man walked out of the bedroom. Defendant and Olvera started to argue in the living room. Defendant kept yelling at Olvera to give him something. Defendant also acted disrespectfully toward [C.V.]. [C.V.] asked [J.L.] to tell

---

**5**     "After Olvera was arrested, he agreed to answer questions and said he did not know defendant, he did not know [C.V.] or her boyfriend, he was not at a party with them, and he did not shoot at anyone. Olvera said he was walking through the apartment complex to meet a girl, but she did not live in that building."

them to leave, and [J.L.] did so.  Defendant, Olvera, and the third man left the apartment, and [C.V.] locked the door behind them.

"[C.V.] testified that 'a few seconds' after they left, defendant kicked down the door of her apartment, and Olvera was with him.  [C.V.] told them to leave and closed the door.  She did not hear any gunshots.  They never returned to her apartment, and she thought they were arrested a few minutes later.

"[C.V.] testified the police searched her apartment several hours later.  She had no idea why a revolver was found in the attic of her daughter's bedroom.[6]  [C.V.] admitted that when she was interviewed by the police, she said that defendant and Olvera argued about a gun, but insisted that she never saw a firearm that night."

The prosecution's gang expert testified that three men, J.L., R.M., and G.O., along with [C.V.] were at [C.V.]'s apartment when it was searched; the three men were Norteno gang members and [C.V.] was described as a "Norteno associate."  The prosecution also introduced evidence that defendant and Olvera were active Norteno gang members. (*Uriostegui*, *supra*, F060232.)

## **PROCEDURAL BACKGROUND**

On November 25, 2009, an information was filed in the Superior Court of Merced County charging defendant Uriostegui and codefendant Olvera with count 1, attempted premeditated murder of Walker (§§ 664/187); count 2, discharge of a firearm at an occupied vehicle (§ 246); and count 3, participation in a criminal street gang (§ 186.22, subd. (a)).  As to counts 1 and 2, it was alleged that the offenses were committed to benefit a criminal street gang (§ 186.22, subd. (b)); and defendant had a prior strike conviction (§ 667, subds.(b)–(i)).

---

**6**     "The defense called an officer who participated in the search who explained that area of the attic could have been reached through crawl spaces from both apartment No. 22 and No. 10, but the revolver was directly adjacent to the opening from No. 22."

As to count 1, it was further alleged that Olvera personally discharged a firearm (§ 12022.53, subd. (c)); and as to defendant, that a principal discharged a firearm during the commission of the offense (§ 12022.53, subds. (c), (e)(1)).

**Trial and Instructions**

In 2010, a joint jury trial was held for defendant and Olvera. The trial court instructed the jury with CALCRIM No. 601 on the elements of attempted murder, premeditation, and deliberation.

The trial court gave the following version of CALCRIM No. 400, aiding and abetting.

> "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it.
>
> "*Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime.*"[7] (Italics added.)

The court also gave CALCRIM No. 401, defining direct aiding and abetting an intended crime:

> " 'To prove that a defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that, number one, the perpetrator committed the crime. Number two, the defendant knew that the perpetrator intended to commit the crime. Number three, before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime, and number four, the defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime.

---

[7] As we explain below, the trial court erroneously included the italicized paragraph, referring to the natural and probable consequences doctrine, when it gave CALCRIM No. 400.

10.

" 'Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose, and he or she specifically intends to and does, in fact, aid, facilitate, promote, encourage or instigate the perpetrator's commission of that crime.  If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abett[o]r.

" 'If you conclude that the defendant was present at the scene of the crime or failed to prevent a crime, you may consider that fact in determining whether the defendant was an aider and abett[o]r.  However, the fact that a person is present at the scene of a crime or fails to prevent the crime, does not by itself make him or her an aider and abett[o]r." (*Uriostegui*, *supra*, F060232.)

The trial court did not instruct the jury with CALCRIM No. 403 on the natural and probable consequences doctrine, or target/nontarget offenses.

**Closing Arguments**

As set forth in this court's opinion in defendant's direct appeal, "[i]n their closing arguments, none of the parties argued that defendant and Olvera intended to commit a robbery, carjacking, or some other offense, or that the attempted murder occurred in the course of committing another target offense.  Instead, the prosecutor repeatedly asserted that defendant and Olvera were guilty of attempted murder because they committed a 'concerted ambush' on Walker, they planned the attack, Olvera fired the gun but he had time to hide the gun at the apartment and clean his hands, and defendant did not fire the weapon but was guilty of aiding and abetting counts [1] and [2].  There was the intent to kill because all of the bullets were aimed at the passenger cab of Walker's truck. Defendant and Olvera 'worked in concert with each other to put Officer Walker in a much more dangerous position so the shooting could occur.'  Defendant walked in front of Walker's truck and made him stop, and then defendant gave 'the high sign' to Olvera to 'take care of business, and immediately after that starts shooting.  His whole attack was a planned ambush.' "

"Defendant's attorney argued that it was just a theory that defendant walked in front of Walker's truck to stop it, and the prosecution had failed to present proof beyond a

11.

reasonable doubt to support the charged offenses.  Defendant's attorney argued that defendant walked into the street at 4:30 a.m. because he was intoxicated, and not because he was part of some type of ambush, and cited to the evidence that defendant was drunk at [C.V.'s] party.  Olvera's attorney challenged Walker's identification of Olvera at the in-field showup, and noted that Walker never saw the gunman.  In rebuttal, the prosecutor asserted Walker positively identified both defendant and Olvera." (*Uriostegui*, *supra*, F060232.)

## Verdicts and Sentences

On March 8, 2010, the jury found defendant guilty as charged in counts 1, 2, and 3, and found the special allegations true.  The trial court found the prior strike conviction true.  Defendant was sentenced to the second strike term of 30 years to life for attempted murder.

Codefendant Olvera was convicted of count 3, participation in a criminal street gang.  The jury was unable to reach unanimous verdicts as to count 1, attempted murder, and count 2, discharge of a firearm at an occupied vehicle, and the court declared mistrials on those counts.

## Direct Appeal

In 2011, this court filed the nonpublished opinion in defendant's direct appeal, (*Uriostegui*, *supra*, F060232), and affirmed the judgment.  We rejected his arguments that there was insufficient evidence to support his convictions as an aider and abettor for count 1, attempted murder, and count 2, discharge of a firearm at an occupied vehicle; the trial court improperly permitted Walker to testify about his interpretation of defendants conduct while he stood in front of Walker's truck; the prosecution's gang expert improperly testified about a hypothetical which was similar to the facts of the instant case; and his sentence was improperly calculated.

Defendant also argued that when the trial court gave CALCRIM No. 400, it erroneously included the last paragraph of the instruction, as italicized *ante*.  Defendant

asserted that paragraph addressed the natural and probable consequences doctrine, and it should have been deleted because the record showed that the court and the parties decided not to instruct the jury with CALCRIM No. 403 about that doctrine. Defendant argued the mistaken inclusion of that paragraph in CALCRIM No. 400 was prejudicial because it could have triggered the jury's consideration of his culpability under the natural and probable consequences doctrine.

We reviewed the court's discussion with the parties about the instructions, and found there was an agreement not to instruct the jury about the natural and probable consequences doctrine pursuant to CALCRIM No. 403. We further found the final paragraph of CALCRIM No. 400 implicated the natural and probable cause doctrine, and the court erroneously included that paragraph when it gave the instruction.

We concluded the trial court's erroneous inclusion of the final paragraph of CALCRIM No. 400 was not prejudicial under the circumstances of the case. " 'Because the parties made no reference to the "natural and probable consequences" doctrine in their arguments to the jury, it is highly unlikely that the jury relied on that rule when it convicted defendant,' and it appears the jury was persuaded by the prosecutor's argument that defendant encouraged or assisted the gunman to murder the truck's driver, and he was thus guilty of attempted murder as an accomplice to that crime, 'not as an accomplice to some other unlawful act of which the murder was a natural and probable consequence.' (*People v. Prettyman* [(1996)] 14 Cal.4th [248,] 273.)" (*Uriostegui*, *supra*, F060232)

## PETITION FOR RESENTENCING

On March 18, 2022, defendant filed, in propria persona, a petition for resentencing and requested appointment of counsel. Defendant filed a supporting declaration that he was eligible for resentencing because he was charged and convicted of attempted murder, he was not the actual shooter, he was convicted as an accomplice under the natural and

13.

probable consequences doctrine, and he could not presently be convicted of murder or attempted murder because of changes made to sections 188 and 189.

The court appointed the public defender's office to represent defendant.

**The Prosecution's Opposition**

On May 12, 2022, the prosecution filed an opposition, which reviewed the facts and argued the facts showed defendant was convicted as a direct aider and abettor who acted with premeditation and the specific intent to kill, and there was no target offense that would have implicated the natural and probable consequences doctrine.

**Defendant's Responsive Motions[8]**

Defendant filed, in propria persona, two replies, and argued the trial court should hold a hearing on the prima facie issue and conduct an evidentiary hearing, because he was not the actual shooter, the jury was instructed on the natural and probable consequences doctrine, he was convicted as an accomplice who did not have the intent to kill, and he could not be convicted of a more serious offense than his codefendant, who was the actual shooter.

**Further Briefing**

The prosecution filed a response, again asserted defendant was not eligible for resentencing, and submitted the record from defendant's jury trial as a supporting exhibit. On March 15, 2023, defendant's counsel refiled defendant's in propria persona reply brief.

**HEARING ON THE PETITION**

On May 18, 2023, the trial court held the prima facie hearing on defendant's petition.

---

[8] During briefing on the petition, defendant filed, in propria persona, a motion for the trial court to discharge his appointed counsel, and requested appointment of a new attorney or to represent himself. When the trial court convened a hearing on this matter, defendant stated he was withdrawing his motion.

Defense counsel conceded the trial court did not instruct the jury with CALCRIM No. 403 on the natural and probable consequences doctrine. Counsel argued an evidentiary hearing should be held because the court included language in the final paragraph of CALCRIM No. 400 that permitted the jury to rely on that doctrine.

The prosecutor replied that defendant was ineligible for resentencing because he was charged and convicted of premeditated, willful, and deliberate attempted murder, which meant the jury found he had the specific intent to kill, and he could not have been convicted based on the natural and probable consequences doctrine. The prosecutor argued the last paragraph of CALCRIM No. 400, as given to the jury, was not prejudicial based on *People v. Estrada* (2022) 77 Cal.App.5th 941, which held the reference to imputed malice in CALCRIM No. 400 did not make a defendant eligible for section 1172.6 relief.

The trial court agreed with the prosecutor's arguments and denied the petition, and stated it would file an order explaining its reasons.

**The Trial Court's Ruling**

Thereafter, the trial court filed an order that denied defendant's petition. The court found defendant was charged and convicted of attempted murder as a direct aider and abettor, with the special allegation that the offense was willful, deliberate, and premeditated. The court held the charges "did not allow the prosecution to proceed under the natural and probable consequences doctrine because the attempted murder, a specific intent crime, was further charged as having been willful, deliberate, and premeditated."

The trial court further found the jury was instructed on direct aiding and abetting, and "[n]o one at trial argued that the facts and evidence supported a conviction under the natural and probable consequences doctrine." While the final paragraph in CALCRIM No. 400 was erroneously given to the jury, the court found the error was not prejudicial because that paragraph cited a correct legal principal "with no application to the case," CALCRIM No. 403 was not given, "no party argued that [defendant] and Olvera intended

15.

to commit some other offense, or that the attempted murder occurred in the course of committing a different target offense," and "[n]o one argued the natural and probable consequences doctrine as a basis for conviction or acquittal."

On May 18, 2023, defendant filed a notice of appeal.

## DISCUSSION

As explained above, appellate counsel filed a brief with this court pursuant to *Delgadillo*. The brief also included counsel's declaration that defendant was advised he could file his own brief with this court. This court advised defendant that he could file a supplemental letter brief. Defendant filed a letter brief and raises several issues.

### I.  Defendant's Conviction for Attempted Premeditated Murder

Defendant asserts his petition stated a prima facie case and the trial court should have held an evidentiary hearing because the jury was instructed on the natural and probable consequences doctrine, the jury was not instructed on malice aforethought for an aider and abettor to attempted murder, and he could not be convicted of a more serious crime than the codefendant and actual shooter. Defendant argues the trial court improperly made factual findings when it determined he failed to state a prima facie case.

### A.  Section 1172.6

In making the prima facie determination, a petitioner is ineligible for resentencing "as a matter of law if the record of conviction conclusively establishes, with no factfinding, weighing of evidence, or credibility determinations," that the petitioner could still be convicted after the amendments to sections 188 and 189. (*People v. Lopez* (2022) 78 Cal.App.5th 1, 13–14.) "In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.'" (*Lewis*, *supra*, 11 Cal.5th at p. 972.)

"The record of conviction will necessarily inform the trial court's prima facie inquiry under section [1172.6], allowing the court to distinguish petitions with potential

merit from those that are clearly meritless." (*Lewis*, *supra*, 11 Cal.5th at p. 971.) The record of conviction includes the jury instructions, verdicts, and closing arguments of the attorneys. (*Lopez*, *supra*, 78 Cal.App.5th 1, 13–14; *People v. Williams* (2022) 86 Cal.App.5th 1244, 1251–1252; *People v. Harden* (2022) 81 Cal.App.5th 45, 50, 54–55; *People v. Ervin* (2021) 72 Cal.App.5th 90, 99; *People v. Jenkins* (2021) 70 Cal.App.5th 924, 935; *People v. Offley* (2020) 48 Cal.App.5th 588, 599.)

To demonstrate prejudice from the denial of a section 1172.6 petition before the issuance of an order to show cause, the petitioner must show it is reasonably probable that, absent error, his or her petition would not have been summarily denied without an evidentiary hearing. (*Lewis*, *supra*, 11 Cal.5th at pp. 957, 974–975; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

## B.  Attempted Murder and Premeditation

The elements of attempted murder are the specific intent to kill (express malice) and the commission of a direct but ineffectual act towards accomplishing the intended killing. (*People v. Lee* (2003) 31 Cal.4th 613, 623; *People v. Gonzalez* (2012) 54 Cal.4th 643, 653, 664; *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 642.) Implied malice cannot support a conviction of attempted murder. (*People v. Bland* (2002) 28 Cal.4th 313, 327.)

"[U]nlike murder, attempted murder is not divided into degrees. The prosecution, though, can seek a special finding that the attempted murder was willful, deliberate, and premeditated, for purposes of a sentencing enhancement." (*People v. Mejia* (2012) 211 Cal.App.4th 586, 605.) " 'Willful' is synonymous with 'express malice': in other words, a specific intent to kill. [Citation.] Premeditation occurs when the [attempted] killing is ' "considered beforehand," ' and deliberation occurs when the decision to kill is ' "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." [Citation.]' " (*Id*. at p. 604.)

Prior to the enactment of Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), a person who knowingly aided and abetted a crime (the target offense), the natural and probable consequences of which was attempted murder or murder (the nontarget offense), could be convicted of not only the target crime but also of the resulting nontarget offense of attempted murder or murder. (*People v. Coley* (2022) 77 Cal.App.5th 539, 548; *People v. Gentile* (2020) 10 Cal.5th 830, 843, 845; *People v. Chiu* (2014) 59 Cal.4th 155, 161, 166; *People v. Prettyman*, *supra*, 14 Cal.4th 248, 259, 262.)

Senate Bill 1437 amended section 188 to eliminate natural and probable consequences liability for first and second degree murder. (*People v. Garrison* (2021) 73 Cal.App.5th 735, 742.) Senate Bill No. 775 (2021–2022 Reg. Sess.), which became effective in 2022, "clarified Senate Bill 1437 by amending [former] section 1170.95 to make clear the natural and probable consequences doctrine no longer supplies accomplice liability to attempted murder." (*People v. Sanchez* (2022) 75 Cal.App.5th 191, 193.) "Because section 188, subdivision (a)(3), prohibits imputing malice based solely on participation in a crime, the natural and probable consequences doctrine cannot prove an accomplice committed attempted murder. Accordingly, the natural and probable consequences doctrine theory … is now invalid." (*Id*. at p. 196; *People v. Coley*, *supra*, 77 Cal.App.5th at p. 548.)

## C. Analysis

As this court extensively discussed in defendant's direct appeal, the trial court erroneously included the final paragraph of CALCRIM No. 400, implicating the natural and probable consequences doctrine, when it instructed the jury. As we also explained, the jury was not instructed with CALCRIM No. 403 that would have defined the natural and probable consequences doctrine, or on any target and/or nontarget offenses. Moreover, the parties did not address the natural and probable consequences doctrine in their closing arguments. The prosecution argued defendant was guilty as a direct aider

and abettor, consistent with CALCRIM No. 401, and defense counsel questioned whether there was evidence to show defendant was acting with intent and premeditation.

The jury found defendant guilty of attempted murder, and also found true the special allegation that he committed the offense willfully, deliberatively, and with premeditation. The jury's verdict and premeditation finding refutes any possibility that it relied on the last paragraph of CALCRIM No. 400, or on some aspect of the natural and probable consequences doctrine. Instead, the jury's finding establishes that it found defendant "acted with actual malice sufficient to sustain the murder conviction under the law as amended by Senate Bill No. 1437 …. (See *People v. Concha* (2009) 47 Cal.4th 653, 662 … ['[W]hen malice is *express* because the defendant possessed a specific intent to kill, first degree murder liability may be proper if the charged defendant personally acted willfully, deliberately, and with premeditation.']; *People v. McCoy* (2001) 25 Cal.4th 1111, 1123 … ['Absent some circumstance negating malice one cannot knowingly and intentionally help another commit an unlawful killing without acting with malice.']; *People v. Thomas* (1945) 25 Cal.2d 880, 900 … [to prove a defendant premeditated and deliberated the consequences of his action, there must be 'substantially more reflection than may be involved in the mere formation of a specific intent to kill'].)" (*People v. Romero* (2022) 80 Cal.App.5th 145, 153; see also *People v. Estrada*, *supra*, 77 Cal.App.5th at pp. 946–949.)

Finally, when the trial court denied defendant's petition for resentencing, it made factual findings from the trial record, and concluded that the evidence showed defendant aided and abetted the attempted murder with the intent to kill. The court improperly made these factual findings in ruling upon the prima facie issue. (*Lewis*, *supra*, 11 Cal.5th at p. 972.) To the extent the court erroneously relied on those factual findings, any error is not prejudicial because, based upon the jury instructions and verdict, it is not reasonably probable that an evidentiary hearing would have been held in the absence of the error.

## II. Defendant's Other Contentions

In his letter brief, defendant asserts his codefendant was the lone shooter who eventually pleaded guilty to assault with a firearm, and he cannot receive a harsher sentence than the actual shooter. Defendant also asserts this court must vacate the gang conviction and enhancements because of the enactment of Assembly Bill No. 333 (2021–2022 Reg. Sess.), and the sentences for the gang offenses and the firearm enhancements were improperly imposed.

Defendant's claims are solely related to his jury trial and convictions. "The mere filing of a section [1172.6] petition does not afford the petitioner a new opportunity to raise claims of trial error or attack the sufficiency of the evidence supporting the jury's findings. To the contrary, '[n]othing in the language of section [1172.6] suggests it was intended to provide redress for allegedly erroneous prior factfinding.… The purpose of section [1172.6] is to give defendants the benefit of amended sections 188 and 189 with respect to issues not previously determined, not to provide a do-over on factual disputes that have already been resolved.' " (*People v. Farfan* (2021) 71 Cal.App.5th 942, 947; *People v. DeHuff* (2021) 63 Cal.App.5th 428, 438.)

As for defendant's arguments about Assembly Bill No. 333 (2021–2022 Reg. Sess.), the amended legislation applies to all cases that are not yet final as of its effective date of January 1, 2022. (*People v. Tran* (2022) 13 Cal.5th 1169, 1206–1207.) Defendant's case has long been final and he is not subject to resentencing. (See, e.g., *People v. Padilla* (2022) 13 Cal.5th 152, 161–162.)

## DISPOSITION

The court's order of May 18, 2023, denying defendant's section 1172.6 petition for resentencing, is affirmed.