Filed 2/28/25  P. v. Ramos CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROY EDDY RAMOS,<br><br>    Defendant and Appellant. | B332623<br><br>(Los Angeles County<br>Super. Ct. No. VA157242) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura F. Priver Judge.  Affirmed with instructions.

Victor Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Roy Eddie Ramos, Jr. fatally stabbed Ron Quinones during an altercation at a riverbed encampment. No one else saw the altercation, but another resident of the encampment, C.G., overheard it.[1] C.G. identified appellant as the perpetrator and testified about what he heard at appellant's murder trial. Appellant also testified at trial, claiming that he stabbed Quinones in self-defense after Quinones "rushed" him, choked him, and attacked him with a piece of wood. The jury rejected appellant's self-defense theory and found him guilty of second degree murder. It also found appellant guilty of intimidating C.G. and dissuading his testimony by force or threat.

Appellant now contends that the murder conviction must be reversed because the evidence was insufficient to prove that he did not act in perfect or imperfect self-defense or in the heat of passion. He further contends that the evidence was insufficient to support jury instructions on the mutual combat and initial aggressor exceptions to self-defense, that the court should have stayed one of his sentences for witness tampering under Penal Code section 654[2], and that the abstract of judgment should be corrected to reflect his true name. We order the abstract of judgment modified to reflect appellant's true name, Roy Eddie Ramos, Jr., but otherwise affirm appellant's convictions and sentence.

---

[1]    We refer to victim C.G. by initials to protect his privacy. (See Cal. Rules of Court, rule 8.90(b)(4).)

[2]    All further statutory references are to the Penal Code unless otherwise indicated.

## PROCEDURAL HISTORY

An amended information filed May 3, 2023 charged appellant with the murder of Quinones (§ 187, subd. (a), count 1), the intimidation of C.G. (§ 137, subd. (b), count 2), and the dissuasion of C.G. by force or threat (§ 136.1, subd. (c)(1), count 3). The information alleged as aggravating circumstances that appellant was armed with a knife, engaged in violent conduct indicating a serious danger to society, committed the charged offenses while on parole, and served prior prison terms. (Cal. Rules of Court, rules 4.421(a)(2), (b)(1), (b)(3), (b)(4).) It also alleged that appellant suffered three prior strike convictions. (§§ 667, subds. (b)-(j), 1170.12.)

During appellant's jury trial, outside the presence of the jury, appellant admitted and the court found true the aggravating factors and prior convictions. The jury found appellant guilty of second degree murder, witness intimidation, and witness dissuasion.

Prior to sentencing, appellant filed a motion to dismiss his strike convictions under section 1385 and *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497. The trial court granted the motion in part. With respect to the murder count, count 1, the court struck one of appellant's strikes and sentenced him as a second striker: it imposed the mandatory term of 15 years to life, and tripled the minimum parole eligibility to 45 years. On count 3, the court struck two of appellant's strikes but imposed the high term of four years, which it doubled to eight years due to the remaining strike. On count 2, the court struck all three strikes and imposed the midterm of three years, which it ordered to run concurrent with the eight-year sentence on count 3. Appellant's total sentence was thus 53 years to life.

Appellant timely appealed.

## FACTUAL BACKGROUND

### I. Prosecution Evidence

#### A. Background

In November 2021, appellant lived at a riverbed encampment in Santa Fe Springs that consisted of 20 to 25 people living in tents. C.G. also lived there, as did victim Ron Quinones's son, Rory Quinones.[3] Quinones did not live at the encampment but visited often. During one such visit, about three or four days before the November 21, 2021 stabbing, Quinones's car was stolen. Quinones's belongings, including his wallet, phone, identification, and backpack were stolen along with the car. C.G. testified that Quinones was "very upset" and "angry" about the theft and "the whole situation," and was "blaming people" that C.G. did not believe were involved, "trying to make it a big conspiracy."

#### B. Stabbing Incident

Around 10:00 p.m. on November 21, 2021, C.G. was in his tent when Quinones came by. C.G. told Quinones, "I don't want anything to do with it," and Quinones left without saying much more to C.G., who remained in his tent. About two minutes later, C.G. heard Quinones having a loud conversation with Joo Heon Cha nearby. C.G. testified that the conversation was "somewhat" heated, with "a little bit of yelling." According to C.G., Cha was upset that Rory had come to his house, and Quinones denied sending Rory there and refused to apologize to Cha.[4] C.G.

---

[3] We refer to Ron Quinones as "Quinones" and Rory Quinones as "Rory" to avoid confusion.

[4] Cha reluctantly appeared at trial and repeatedly stated that he did not want to be there or cooperate. He nevertheless

testified that Quinones "was more just defensive" than angry. C.G. did not hear the discussion turn physical.

Shortly thereafter, Quinones walked to Rory's tent, which C.G. estimated was "maybe 50, 150 feet" from his own. C.G. heard him having a "very heated argument" with appellant. C.G. testified that Quinones was "livid yelling." C.G. "couldn't make out what they were saying, exactly," but "thought [he] made out [appellant] saying, um, 'you can't talk to me or my girlfriend like that.'"[5] C.G. heard appellant and Quinones yelling "for a while," indistinctly, before Quinones "clearly yelled, 'oh, you've got a knife? You've got a knife. Are you going to stab me? You're really going to stab me?'"

C.G. continued, "Not long after that, I heard they weren't yelling anymore. And I heard scuffling and feet moving. It sounded like fighting for about – only about three to six seconds." He reiterated on cross-examination that the scuffle "was very short," "maybe like between three and eight seconds." C.G. then heard Quinones "scream in pain twice." Quinones yelled, "'You stabbed me. You f'ing stabbed me,'" and "'Wow, you really f'ing stabbed me.'" C.G. "didn't hear much" after that.

At that point, C.G. decided "to go help Ron because he was stabbed, obviously." He put on his shoes, left his tent, and walked over to Rory's tent cautiously, "because I didn't want to

---

testified that he had argued with Quinones on November 21, 2021, and that Quinones was "angry" afterward. Cha testified that he did not remember hearing anything after that, though he admitted that he called 911. On cross-examination, Cha was impeached with his preliminary hearing testimony that he used heroin with Quinones and heard Quinones "going all crazy and like arguing" on November 21, 2021.

[5] When he took the stand for the defense, appellant testified that he lived with his girlfriend Jordan at the encampment.

run over to a knife fight." C.G. saw Quinones lying unconscious on the ground amid "all kind of trash and stuff," but did not see any weapons in Quinones's hand or vicinity. C.G. lifted Quinones's shirt and saw stab wounds that were not bleeding. By that point, Cha had also arrived on the scene, and the two men unsuccessfully tried to render aid. Both C.G. and Cha called 911, and C.G. left to help direct the first responders.

By the time C.G. returned to Quinones's location with two police officers, Quinones's mouth was no longer moving. The officers performed chest compressions, but Quinones died before paramedics arrived. C.G. told the officers what had happened, but did not implicate appellant because he "was scared other people would hear." He also testified that "in that lifestyle, you're not supposed to speak with police."

A deputy medical examiner testified that Quinones, who was 5'7" and weighed 189 pounds, suffered three stab wounds. One of the stab wounds was 3.5 inches deep and pierced the right ventricle of Quinones's heart. Another, 2.5 inches deep, incised both his heart and lung. Both these wounds were fatal. The third stab wound was mostly under Quinones's left armpit and was not fatal. The medical examiner was not able to determine the order in which the wounds were inflicted.

The medical examiner testified that Quinones did not have any defensive marks on his body. A toxicology screening was positive for methamphetamine, heroin, and fentanyl. The medical examiner opined that these substances may have accelerated Quinones's death, but did not "change the manner or the cause of death," the fatal stab wounds.

### C.    Initial Investigation and Arrest of Appellant

Whittier Police Department officer Erica Kohout testified that she responded to a call about a stabbing at around 10:40 p.m. on November 21, 2021. C.G. led Kohout and her partner to

6

Quinones, who was unresponsive. Kohout observed two stab wounds on Quinones. There was debris around him. C.G. identified Quinones and told Kohout what he had heard.

Whittier Police Department detective Christopher Leffler testified that he arrived on the scene after Quinones had been pronounced dead. He "looked over" Quinones's "entire body" and did not see any injuries that indicated Quinones had been involved in a physical altercation. Leffler also examined the area surrounding Quinones. He did not see "[a]nything that looked like a weapon that could have been used," including knives, guns, pipes, and two-by-fours. Quinones had three $100 bills and one $10 bill in his pockets.

Leffler spoke to C.G. near his police vehicle, about a "quarter mile away from the scene." C.G. was "very nervous, scared, said he wanted to do the right thing, but he didn't want to be there." The following day, C.G. told Leffler that appellant was the one who stabbed Quinones. Within a week, C.G. identified appellant in a lineup and "made a statement that that was the voice I heard." Leffler spoke to Cha at some later point. Cha "was very nervous, sweaty, appeared to be a little paranoid. He stated he was scared to even be at the location with us." Cha told Leffler that he saw appellant "walking away from the actual incident as soon as it happened afterwards," but he "didn't want to make any other statement until his safety was guaranteed."

The day after the stabbing, Leffler returned to the encampment. Appellant saw Leffler and "immediately went to a bicycle" and rode away from the scene. Leffler and other officers pursued appellant and arrested him about five to ten minutes later. Another officer searched appellant and found a pocketknife.

### D. *Perkins* Operation

Leffler did not tell appellant he was being arrested for murder. He also told other officers not to mention murder. Leffler placed appellant in a cell with two informants pursuant to *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*). A recording of appellant's conversation with the informants was admitted into evidence.

Appellant told the informants that the police were "trying to get me for murder" in connection with "a stabbing" that "happened last night." Appellant told the informants that he lived in an encampment and the "punk ass dude" "goes over there and sees his son." The dude "got his carjacked [*sic*]" and was "being a little bitch." Appellant tried to buy "a dime off him," but he "gave me, like, not even a point, bro." Appellant told the dude to give him his money back, but he said "no, fuck you." After going back and forth about the refund for a bit, appellant said, "the motherfucker swung on me so I fuckin' hit him" twice on the left side.

An informant asked appellant if he got "rid of that shit," and appellant replied that he did. Appellant added that the dude "didn't die from the stab wounds though. He had a heart attack." One of the informants asked appellant if he had "just let him have it," and appellant replied, "No. I  -- he didn't know I did it, dude." When the informants followed up, asking, if appellant "just went off" or "just went mad or what," appellant stated, "Nah. I wasn't even – like, he swung at me with a big ass fuckin' stick." Appellant added that the stick "broke on my hand," which was why he was currently holding his hand. Appellant said "there was nobody" around at the time of the incident, but "somebody put me on blast."

One of the informants, who claimed he was familiar with appellant, mentioned that appellant had "lost a lot of weight,

dawg." Appellant said that he previously had weighed 220 pounds. He added that he had been homeless for awhile, and that the "dude" he stabbed was not homeless but "was a cool dude" who did not look down on him for it.

After some further discussion during which appellant reiterated that Quinones had ripped him off, appellant told the informants, "You guys are full of shit, aren't you?" Appellant then said, "I made all that up. Yeah. I ain't stupid. . . . [T]hey put you in the cell with two other dudes. You're full of shit."

Leffler then came by the cell and told appellant that he had been at the encampment investigating a homicide. Leffler added that the officers recognized appellant and wanted to talk to him because "[p]eople said you were at the murder." When Leffler left, appellant reiterated that he "made some shit up."

### E.     Interview with Appellant

Leffler interviewed appellant immediately after the *Perkins* operation. The interview was recorded and admitted into evidence.

Leffler told appellant that "witnesses" said he had been at the encampment at the time of Quinones's murder. Appellant said he did not know what had happened but "heard four different stories" about the incident, including that Quinones died from a heart attack, a stroke, a stabbing, and a shooting. Leffler informed appellant that Quinones had been stabbed and witnesses said appellant was the one who stabbed him. Appellant said that was "fuckin' crazy," and that people at the encampment had "been blaming me for all kinds of shit." Appellant admitted that he knew Quinones but denied arguing with him; he said Quinones was "cool as fuck, man."

Leffler responded that "everyone" was saying that they heard appellant fighting with Quinones, heard Quinones say he had been stabbed, and saw appellant leave the scene. Appellant

9

said that was a lie; he bought a "dime of heroin" from Quinones, "took off," "and that was it." He reiterated that "[t]hem motherfuckers are lying."

Appellant told Leffler that he was 5'2" and weighed only 95 pounds. When Leffler insinuated that appellant was right-handed, and Quinones's stab wounds were on his left side, appellant said he had "right side weakness" from a stroke he suffered in 2017. Leffler responded that appellant was "hauling ass" and "acted like nothing was wrong with you" when officers chased him earlier in the day. Appellant said if he had been at 100 percent, "you wouldn't have caught me." Appellant also said there were "a lot of five foot two guys" around the encampment, and "you're fucking wrong right there." He again denied any involvement in the incident before ending the conversation.

On the stand, Leffler testified that appellant was "a lot bigger" than 5'2" and 95 pounds at the time of his arrest. He said appellant was in "really good shape" and estimated he was about 5'6" or 5'7" and weighed "[a]round 190, 195."

### F.    Jail Phone Calls

Two phone calls appellant made from jail were recorded and admitted into evidence. The first call, made on December 31, 2021, involved two people C.G. identified as appellant and "Tic."

Appellant told Tic that Cha "fucking pointed me out in a six pack because he knew me but he didn't work with the cops." Appellant said C.G. was "the one that's fucking talking and fucking doing everything, bro." He told Tic, "make sure you talk to that fool, fucking, because all, all he has to do is say 'no, I heard him try to get his money back' cuz that fool tried to take my money. He wouldn't give me a refund. He was like 'I don't do refunds' and shit when I tried to buy a dime. He tried to burn me. So, you know, even in the camera it shows that I didn't move until that fool swung on me and shit, dog. Once he swung on me,

10

it's over I have a right to defend myself."[6]  Appellant later reiterated, "I just need [C.G.] to fucking say that he heard me trying to get my money back.  That's what he needs to say or plead the fifth.  You know what I mean?"

Tic responded by asking appellant, "But he, but he did, he did move first, right?"  Appellant replied, "Nah, he fucking went there and said he heard me arguing over fucking Jordyn [*sic*].  That I fucking said 'don't talk about her like that and I started stabbing him.'"  Tic responded, "No, no, no but . . . but like in all actuality like he did do first [*sic*], right?  You?"  Appellant then said, "Oh, yeah, he came at me first.  He came out of the tent, walked around me, and I told him you ain't shit fool, you aren't hard, you ain't a gangster, you ain't nothing and then he said 'why does everyone say that to me?'  And then he fucking rushed me. Know what I mean?  He rushed me, fucking took off on me and I fucking stabbed him twice, then he picked up a long ass 2x4 and swung it at me, and I hit it with my hand and it busted apart, and I stabbed him again.  And that was it!  But I waited, I waited until he rushed me.  Ya' know I ain't dumb. [laughs] Just like in, just those [unintelligible].  You know you swing first, bro. Ya' know what I mean?  Yup.  So I waited. I wasn't gonna fucking, [*sic*] I know better."

Later in the conversation, an unidentified female mentioned that someone named Nico was "telling everyone that you got busted with the knife."  Appellant said, "no it's gone."  He added that he "got busted with two knives, but not, not that knife," because he "ain't stupid."  Later, after appellant stated that he was being charged with "murder one," Tic said "aye you know a dead man can't talk . . . you know what I mean?"

---

[6]     Although there were surveillance cameras near the encampment, none captured footage of the incident.

11

Appellant responded that he "appreciate[d] that man," and again identified C.G. as "the guy who's snitching on me." Tic assured appellant, "I got you, I got you." Appellant again said that C.G. needed to say he heard that appellant was trying to get his money back, "or plead the fifth or, or fucking disappear for ninety days."

In the second call, made on February 14, 2022, Tic told appellant that he "took care of both those problems." Appellant responded, "good, good, good for looking out with that. Yeah. That's good, that's good." An unidentified female told appellant that "they came and subpoenaed a bunch of people down here," and appellant said that was "cool" because they were "character witnesses on my side, right?" He later stated that he needed someone named Meredith to call his lawyer, "[b]ecause she heard that fool say that he won't give a refund. I need her as a character witness for me."[7] He explained, "she's like the key to everything," because "nobody seen the actual murder so it doesn't matter so they can subpoena whoever they want." Tic said, "murder was self-defense, . . . you hear me?" Appellant responded, "Yeah." He also added that he had "gained twenty pounds" and was "170 now."

### G.     Threats to C.G.

C.G. testified that after he identified appellant and his voice for the police, "within a week" he heard that another resident of the encampment, Tic, "was looking for me to speak with me" because "they have my name in the paperwork or whatever." C.G. believed it would be dangerous to meet with Tic at the encampment. When he heard that Tic was at a nearby gas station, he "hightailed it to the gas station to speak with him in

---

[7]     Neither the prosecution nor the defense called anyone named Meredith as a witness.

public." Tic told C.G. that his name was in police paperwork and C.G. needed "to go in and plead the fifth. Don't say anything." C.G. did not recall his exact response, but testified that he "was just trying to ease his concerns, you know, and let's say that I do what I think he wants."

Tic was arrested a few days after the encounter in the gas station. C.G. testified that when Tic returned to the riverbed encampment a few weeks later, he called C.G. over. C.G. went to Tic, who told him that he had "messed up by speaking to the police" and "that I need to go in and plead the fifth to make up for my mistake, you know, otherwise, you know, he would do bad things to me or kill me." C.G. added that Tic told him that if he "ran, he would be able to track me down through social media or track down family members, stuff like that." C.G. stated that Tic was "just trying to scare me really." When the prosecutor asked if it had worked, C.G. responded "[y]es, definitely it worked."

C.G. stated that he called one of the detectives to inform him of the threats and "to see what my options were." C.G. did not identify Tic by name but mentioned his race. About a week later, officers came to the encampment "asking all my neighbors" about someone who met Tic's physical description. C.G. concluded he was "screwed" at that point, because "if I heard it, Tic heard it." C.G. concluded he had "very few options" but to continue cooperating with police at that point, and called Leffler to tell him he was upset about the threats. Leffler testified that C.G. called him on February 15 and 18, 2022 because he "didn't feel safe where he was at" and "actually felt something was going to happen to him." C.G. filed a report and gave police information about Tic, but they were unable to locate him. C.G. testified that police put him in a hotel "for, like, two days," and he left the riverbed encampment after that.

13

## II.    Defense Evidence

Appellant testified that he became homeless after his mother died and lived in the riverbed encampment for six months.  He lived with his girlfriend, Jordan.  He met Quinones through his son, Rory, and considered him a friend.  Appellant got high with Quinones and sometimes bought dope from him. Appellant was "using a lot of drugs" at the time, including heroin, and was 5'2" and 95 pounds in November 2021.[8]

The week before the stabbing incident, Quinones's car got stolen and "he was blaming everybody" as though "it was a big conspiracy."  The day before the stabbing, appellant saw Quinones and Rory attack C.G.'s tent with an axe because C.G. owed them some fentanyl.[9]  That was the only time appellant had seen Quinones act violently, though he had seen Quinones be "argumentative" before.

On the evening of November 21, 2021, appellant "went to go buy a dime of heroin" from Quinones and gave him a $10 bill for it.  Quinones handed appellant a bindle, but appellant thought it did not look or smell right.  After tasting the product, appellant told Quinones it was not heroin and he did not want it. Quinones told appellant it would still get him high because it contained fentanyl.  Appellant said he did not "mess with that" and gave the bindle back to Quinones.

Appellant asked for his money back, but Quinones told him, "I don't do refunds."  Appellant demanded a refund a second time, but Quinones told him, "'No, get out of here. Get the fuck out before I fuck you up.'"  Appellant thought it was "weird," because

---

[8]    Appellant acknowledged on cross-examination that the booking report from his arrest stated his height was 5'4" and his weight was 165 pounds.

[9]    C.G. did not mention this incident during his testimony.

14

Quinones was "usually not like that." Quinones became "aggressive" and "walked around" appellant. When Quinones "started walking away," appellant told Quinones that Quinones was "not hard" and "not gangster" and again demanded his money back. Quinones said, "'Why does everybody say that to me?'" and "rushed" appellant.

As Quinones rushed appellant, he swung at appellant but misjudged his height and missed. Appellant also swung and grabbed the "collar area" of Quinones's shirt with both hands. Appellant clarified that he was "going to try to trip him," because Quinones was "like six inches taller" and appellant "wanted my money back." Quinones "ended up getting [appellant] in a headlock, like guillotine choke." Appellant was bent over about 90 degrees, and Quinones "was lifting me up by my neck" and "choking me out." Appellant released Quinones's shirt and tried to push on Quinones's stomach. Quinones was "grunting really hard," and appellant "started to see, like, little dots." Appellant could not breathe. He thought Quinones would kill him by choking him out or cause him to lose consciousness and then "stomp my face."

In fear for his life, appellant "kept pushing" at Quinones. While still in the chokehold, appellant grabbed his pocketknife from his back pocket and "swung twice" at Quinones. Appellant did not know he had stabbed Quinones. Quinones released him and said, "'Oh, you stabbed me. Oh, you fucking stabbed me.'" Appellant tried to back away, but found himself blocked by the tent.

Quinones then picked up "a real beaten-up piece of dark wood," like "driftwood" or "a two by four" and "came at" appellant. He swung the wood and missed. As he swung again, appellant "stepped in and blocked it" with his left hand, breaking the wood, while stabbing Quinones again with his right. Appellant testified

15

that he was not aiming for any particular area, but was "just blocking" Quinones because he "was trying to kill me for reals." Quinones backed up, and appellant was able to go around him and leave. Appellant did not think he had severely injured Quinones because he "didn't even do it hard."

As appellant walked away, he saw Cha and another man, Casey, standing nearby. Appellant told Casey to grab his backpack that he had left by the tent. Appellant saw Cha dial 911 and "took off" because he thought, "oh, I'm going to jail." Appellant went back to his tent and told his girlfriend what had happened; she "started freaking out." Appellant waited at his tent for about five minutes, but Casey did not bring his backpack so he got on his bicycle and rode back to the scene of the incident.

Appellant saw that no one but Quinones was around. He got off his bicycle and approached Quinones, who was lying on the ground. Quinones "wasn't really breathing" and "had, like, no pupil in his eye." Appellant yelled his name, and Quinones looked at him. Quinones's "pupils got real big," and appellant told him, "'don't die, bro, like breathe, fool, breathe.'" Appellant looked for his backpack but "took off" when he heard sirens coming and a police officer arrive.

The following day, appellant got rid of the knife. When he returned to the encampment, he heard that Quinones had a heart attack; "that's why he was laying down." He "panicked" when someone told him the police were there and fled. Appellant did not want to talk to police because he abided by the general encampment rule against doing so.

Appellant thought the *Perkins* informants were "just regular inmates." He told them that Quinones had rushed him after a drug deal gone bad, and that he injured his hand blocking the wood and grabbing Quinones's shirt. He did not go into as much detail with the informants as he did on the stand because

16

"I'm a guy" and "I'm going to tell another guy that, like, I was in a headlock and I was scared. I'm not going to get into that."

Appellant acknowledged that he called Tic from jail. He testified that he did not intend for Tic to threaten C.G. He wanted Tic "to go tell him either tell the truth or shut up," because C.G.'s "initial statement was placing my girl at the crime scene" and "that put her in danger." When Tic said something like "a dead man can't talk," appellant thought he was referring to Quinones, not C.G. People later "ended up jumping" appellant's girlfriend, causing her to lose her pregnancy.

Appellant acknowledged that he had prior convictions for making a criminal threat with a gun and assault against a peace officer with a firearm, from 24 and 16 years ago, respectively. He stated that he "always took responsibility for my actions" and pled guilty to both crimes.

On cross-examination, the prosecutor asked appellant about the duration of each phase of his altercation with Quinones. Appellant testified that Quinones's initial rush and swing took "seconds." The shirt-grabbing and headlock happened within "a couple seconds." Quinones "choked out" appellant for somewhere between five and 10 seconds. After appellant escaped the chokehold, another five to 10 seconds passed while appellant backed up and Quinones grabbed the piece of wood.

The prosecutor also asked appellant about Quinones's acquisition of the wood. He testified there was "wood everywhere" at the encampment, including "a little container full of wood" at the scene. When the prosecutor showed appellant a photograph of the scene that had been admitted into evidence, he stated that he did not see any accessible wood in the photograph.

17

## DISCUSSION

## I.    Sufficiency of the Evidence

Appellant contends that the evidence was insufficient to support his conviction for murder.  He asserts that the prosecution's evidence "fails to prove beyond a reasonable doubt that appellant did not kill Quinones in lawful self-defense, in reaction to Quinones's use of deadly force by choking appellant, depriving him of the ability to breathe, and swinging a big piece of wood at him."  He alternatively asserts that even if the evidence fails to establish that he acted in complete self-defense, it "certainly fails to prove beyond a reasonable doubt that appellant did not kill Quinones in *imperfect* self-defense, or in the heat of passion as a result of provocation by Quinones," thus permitting a conviction only for the lesser included offense of voluntary manslaughter.  We disagree.

### A.    Standard of Review

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]  We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]  In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" (*People v. Edwards* (2013) 57 Cal.4th 658, 715.) "Even when there is a significant amount of countervailing evidence, the testimony of a single witness that satisfies the standard is sufficient to uphold the finding." (*People v. Barnwell*

18

(2007) 41 Cal.4th 1038, 1052.)  We do not reweigh or resolve credibility issues or evidentiary conflicts.  (*People v. Gomez* (2018) 6 Cal.5th 243, 280.)

### B.　Legal Principles

Murder is the unlawful killing of a human being with malice aforethought.  (§ 187, subd. (a).)  A killing committed in complete or perfect self-defense is considered a justifiable homicide and is not unlawful.  (*People v. Thomas* (2023) 14 Cal.5th 327, 385-386 (*Thomas*).)  "Perfect self-defense requires that 'one must actually *and* reasonably believe in the necessity of defending oneself from imminent danger of death or great bodily injury.' [Citation.]"  (*Id.* at p. 386, emphasis in original.)  "'To satisfy the imminence requirement, "[f]ear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice.  The defendant's fear must be of *imminent* danger to life or great bodily injury."' [Citation.] "'[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future.  *An imminent peril is one that, from appearances, must be instantly dealt with.*"' [Citation.]"  (*Thomas*, *supra*, 14 Cal.5th at p. 386, emphases in original.)

"Imperfect self-defense, on the other hand, 'occurs when a defendant acts in the actual but unreasonable belief that he or she is in imminent danger of great bodily injury or death.'"  (*Thomas*, *supra*, 14 Cal.5th at p. 386.)  Because it negates the element of malice, imperfect self-defense "reduces an intentional, unlawful killing to voluntary manslaughter, a lesser included offense of murder."  (*Ibid.*)

An intentional, unlawful killing may also be reduced to voluntary manslaughter if the defendant acts while in the heat of passion.  (See *Thomas*, *supra*, 14 Cal.5th at p. 386.)  Heat of passion is a mental state that precludes the formation of malice.

19

(*Ibid.*)  A killing is committed in the heat of passion if it is an unconsidered reaction to provocation rather than the product of rational thought.  (*Ibid.*)  Heat of passion has both objective and subjective components.  (*People v. Dominguez* (2021) 66 Cal.App.5th 163, 174.)  Objectively, the victim's conduct "must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*People v. Moye* (2009) 47 Cal.4th 537, 550.)  "Subjectively, the defendant must have killed while under "'the actual influence of a strong passion" induced by such provocation.' [Citation.]  The passion aroused need not be anger or rage, but can be any intense emotion other than revenge." (*People v. Dominguez, supra*, 66 Cal.App.5th at p. 175.)  "Thus, a defendant's 'immediate fear and panic' can, in an appropriate case, provide evidence from which 'a reasonable jury could infer that defendant was aroused to passion, and his reason was thus obscured. . . .' [Citation.]" (*Ibid.*)

"[W]hen provocation or imperfect self-defense are at issue, the prosecution is compelled to disprove those circumstances beyond a reasonable doubt." (*People v. Schuller* (2023) 15 Cal.5th 237, 254.)  The same is true of perfect self-defense. (*People v. Saavedra* (2007) 156 Cal.App.4th 561, 570.)

### C.    Analysis

Appellant contends the prosecution failed to carry its burden of disproving that he acted in heat of passion or perfect or imperfect self-defense, because "[n]othing in the evidence disproves appellant's account of how Quinones escalated the dispute from a verbal argument to a physical altercation and then to a life-and-death struggle."  He asserts he was the only witness "who actually *observed* the events preceding and during the stabbing," discounting C.G.'s testimony as unreliable  and not contradictory of his own.

20

These arguments can prevail only if appellant's testimony is credited over C.G.'s testimony and other evidence in the record. We do not reweigh the evidence or question the jury's credibility findings when reviewing a record for substantial evidence, however. "'"To warrant the rejection of the statements given by a witness who has been believed by the [trier of fact], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]" . . . . [Citation.]'" (*People v. Barnes* (1986) 42 Cal.3d 284, 306; see also *People v. Cortes* (1999) 71 Cal.App.4th 62, 81 [same].) Appellant's suggestions that C.G.'s testimony should be rejected because he only "thought he heard" certain things and did not visually perceive the incident do not establish physical impossibility or facial falsity. Nor do they establish that appellant's testimony was necessarily more truthful because he saw rather than merely heard the incident. The jury was instructed to consider how well each witness could "see, hear, or otherwise perceive the things about which the witness testified" when evaluating testimony. (CALCRIM No. 226) We presume it followed this instruction when crediting C.G.'s version of events over appellant's. (See *People v. Gonzales* (2011) 51 Cal.4th 894, 940.)

Appellant also asserts that his testimony about the incident was "uncontradicted," and "[n]othing in the evidence disproves appellant's account." These assertions are unsupported by the record. For instance, C.G.'s testimony about the duration of the incident—three to eight seconds—was significantly different from the lengthier timeline appellant gave. C.G.'s testimony about the

context of the fight and Quinones's apprehension of the knife before the stabbing also differed from appellant's. Appellant's testimony was also contradicted by physical evidence, including the lack of any defensive wounds on Quinones and lack of wood near Quinones's body and in photographs of the scene.

Even if appellant's testimony were uncontradicted, the jury was not required to believe it. A jury "may believe all, part, or none of any witness's testimony" (CALCRIM No. 226), and in particular is entitled to "disbelieve those portions of defendant's statements that were obviously self-serving." (*People v. Silva* (2001) 25 Cal.4th 345, 369.) The jury is the "sole judge of the credibility of witnesses" (*People v. Young* (2005) 34 Cal.4th 1149, 1181), and we do not revisit its determination.

Appellant additionally argues that *People v. Collins* (1961) 189 Cal.App.2d 575 (*Collins*) supports reversal. We agree with respondent that *Collins* is distinguishable. In *Collins*, the defendant argued that the evidence introduced at his trial was insufficient to sustain his conviction for manslaughter and instead established that he acted in perfect self-defense as a matter of law. (*Collins, supra*, 189 Cal.App.2d at p. 577.) The appellate court agreed, concluding that the prosecution's evidence, including both the defendant's statement to police and physical evidence, established that defendant killed the victim while actively resisting a forcible sodomy by a larger and more powerful attacker. (See *id.* at pp. 588-593.) Appellant notes that the prosecution here introduced his statements to Leffler, Tic, and the *Perkins* agents, and points to the *Collins* court's statement that "[t]he prosecution, having presented as part of its case the statement of defendant as to how the killing occurred, is bound by that evidence in the absence of proof to the contrary." (*Id.* at p. 591.) In *Collins*, there was no "proof to the contrary." Here, however, the prosecution presented the testimony of a

percipient witness and physical evidence that called appellant's account into question. Moreover, appellant himself gave testimony that differed from the statements he made to Leffler, Tic, and the *Perkins* agents; the jury was not required to believe his explanation that he omitted details in those statements to appear more manly.

Viewed in the light most favorable to the prosecution, the evidence was sufficient to establish that appellant did not act in perfect or imperfect self-defense or the heat of passion. He and Quinones had a verbal argument. Appellant brandished a knife, and an extremely short scuffle ensued. Even by appellant's account, he resumed the argument after Quinones tried to walk away and fatally stabbed Quinones while Quinones was unarmed, before he acquired and wielded the piece of wood, in a dispute over $10. Quinones had no defensive wounds, and no weapons on or near him. Appellant fled the scene, disposed of his knife, and ran from police the following day. While incarcerated, he directed Tic to tell C.G. to either testify in accordance with appellant's version of events, plead the fifth, or "disappear."

## II.    Instructions on Mutual Combat and Initial Aggressor

Appellant contends the court erred by instructing the jury with CALCRIM No. 3471, "Right to Self-Defense: Mutual Combat or Initial Aggressor." He asserts that no evidence showed that he was the initial aggressor during the confrontation with Quinones, or that he and Quinones "had a pre-existing, mutual intention or agreement to engage in mutual combat." Respondent contends that appellant forfeited this contention with respect to the initial aggressor language, and that CALCRIM No. 3471 as given was fully supported by the evidence in any event. We reach the merits of appellant's arguments and conclude that the trial court correctly instructed the jury.

23

### A. Background

During the parties' discussion of jury instructions at the close of the prosecution case, the prosecutor requested that the court include "the mutual combat language" in CALCRIM No. 3471. He explained, "I know the court gave the language for a person who starts a fight, but I do think that there's enough evidence for a juror to also believe that it was a scenario of mutual combat. I think it would be appropriate to instruct on that in the event a juror finds that it was mutual combat." After reviewing the instruction and confirming that the prosecutor wanted to add the bracketed language "engages in mutual combat or," the court asked defense counsel if there were any objections. Defense counsel stated, "Yes, your honor. I don't think there's any evidence it was mutual combat. The evidence that we have is strictly from Mr. Ramos' *Perkins* and the phone call and all that evidence was that the victim Mr. Quinones rushed him and . . ." The court responded, "So I think if we're going to give this instruction, I would give all the language, and make that they can take what language they want out, including that [*sic*]. I'm not sure, though, if this instruction is necessary at all, right, based upon the state of the evidence now. I don't know what's going to ultimately be the state of the evidence, but—so I would either give it all or not at all. So --." Defense counsel interjected, "I'd ask the court to remove that." The prosecutor reiterated, "I think there's enough evidence to indicate that it was mutual combat." The court said it would "think about that one."

At the conclusion of appellant's direct examination, the court ruled that it would "give the entirety of 3471 with the mutual combat language." No objection was made at that time.

After the close of evidence, the court instructed the jury with CALCRIM No. 3471 as follows:

24

"A person who engages in mutual combat or who starts a fight has a right to self-defense only if:

"1. He actually and in good faith tried to stop fighting;

"AND

"2. He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting.

"AND

"3. He gave his opponent a chance to stop fighting.

"If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight.

"A fight is *mutual combat* when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim of self-defense arose."

The court also instructed the jury with CALCRIM No. 3472, which provides, "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." It additionally instructed with CALCRIM No. 3474, which provides, "The right to use force in self-defense continues only as long as the danger exists or reasonably appears to exist. When the attacker no longer appears capable of inflicting any injury, then the right to use force ends."

## B.     Legal Principles and Standard of Review

"'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.'" (*People v. Diaz* (2015) 60 Cal.4th 1176, 1189.) "The trial

court must give instructions on every theory of the case supported by substantial evidence, including defenses that are not inconsistent with the defendant's theory of the case." (*People v. Young, supra,* 34 Cal.4th at p. 1200; see also *People v. Ross* (2007) 155 Cal.App.4th 1033, 1049 (*Ross*) ["A party is entitled to a requested instruction if it is supported by substantial evidence."].) As discussed above, substantial evidence is that which a reasonable jury could find persuasive. (*Ross, supra,* 155 Cal.App.4th at pp. 1049-1050.) Whether there is substantial evidence the defendant was the initial aggressor or engaged in mutual combat is "the dispositive consideration" for deciding to give the instruction. (*Id.* at p. 1052.)

"It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) "Whether or not to give any particular instruction in any particular case entails the resolution of a mixed question of law and fact," but is "predominantly legal" and therefore "examined without deference." (*People v. Waidla* (2000) 22 Cal.4th 690, 733.)

C.     Analysis

We first consider whether appellant preserved his challenge to the "initial aggressor" portion of CALCRIM No. 3471. As a general rule, a party forfeits any challenge to a jury instruction that was correct in law and responsive to the evidence if the party failed to object in the trial court. (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012.) There is no dispute here that CALCRIM No. 3471 was correct in law. Additionally, respondent does not dispute that appellant objected to the mutual combat portion of CALCRIM No. 3471; it asserts that appellant failed to object to the "initial aggressor" language. Appellant replies that he "unambiguously objected to the instruction" because he "specifically contended there was no 'evidence it was mutual

26

combat'" and never overtly agreed there was sufficient evidence to instruct on initial aggressor. He further asserts that his explanation of his objection, that the only evidence regarding the confrontation came from statements appellant made during the *Perkins* operation and jail phone calls, "logically excludes *both* the scenario that appellant and Quinones engaged in 'mutual combat' *and* the scenario that appellant was the 'initial aggressor' against Quinones."

We reject appellant's suggestion that a lack of overt agreement to an instruction preserves a challenge thereto. We also reject his contention that "I don't think there's any evidence it was mutual combat" necessarily encompasses an objection to the initial aggressor language in the instruction. However, we conclude appellant preserved his objection by "ask[ing] the court to remove that" after the court said it was inclined to either give all of CALCRIM No. 3471 or none of it.

We thus proceed to the merits of appellant's argument: there was no substantial evidence that he was either the initial aggressor or engaged in mutual combat with Quinones. With regard to initial aggressor, appellant again contends that "[n]o evidence contradicts appellant's chronology of the altercation," and that the prosecution's reliance on C.G.'s testimony was "misplaced." As discussed above, the jury was entitled to credit C.G.'s testimony, which, along with other evidence, contradicted appellant's testimony about the altercation. We accordingly reject appellant's arguments.

As to mutual combat, appellant contends there was no evidence that he and Quinones "had a preexisting mutual agreement or intention, express or implied, to fight each other on the night of the stabbing, before Quinones initiated and then escalated the physical altercation." He relies on *Ross, supra*, 155 Cal.App.4th at p. 1045 for the proposition that "it is not merely

the *combat*, but the *preexisting intention to engage in it*, that must be mutual." Apparently interpreting the phrase "preexisting intention" to require a longstanding dispute, appellant asserts there was "simply no evidence of any interactions between appellant and Quinones prior to the night of the stabbing, except for one occasion where appellant allowed Quinones to borrow his bike, occasions when appellant would take drugs with Quinones and his son, and occasions when Quinones would sell drugs to appellant." Mutual combat is "not merely a reciprocal exchange of blows but one *pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities*." (*Ross*, *supra*, 155 Cal.App.4th at p. 1045, emphasis in original.) The violent confrontation must be "conducted pursuant to prearrangement, mutual consent, or an express or implied agreement to fight." (*Id.* at p. 1036.) "The agreement need not have all the characteristics of a legally binding contract," but "there must be evidence from which the jury could reasonably find that *both combatants actually consented or intended to fight before the claimed occasion for self-defense arose*." (*Id.* at p. 1047, emphasis in original.)

Here, there was substantial evidence that appellant and Quinones had a "mutual intent[ ], consent, or agreement" to engage in a physical fight before they actually exchanged blows. Appellant testified that he and Quinones verbally sparred, and Quinones threatened to "fuck [him] up" before the physical fight began. C.G. testified that he heard appellant and Quinones yelling at one another for some time, before he heard Quinones yell, "'oh, you've got a knife? You've got a knife. Are you going to stab me? You're really going to stab me?'" Only then did C.G. hear "scuffling and feet moving." A reasonable jury could find from this evidence that Quinones intended to fight appellant by telling him to "Get the fuck out before I fuck you up," that

28

appellant intended to fight Quinones by brandishing a knife and threatening to stab him rather than leaving, and that both men formed and expressed this intent before physically attacking one another.

Appellant suggests the temporal interval "before the claimed occasion for self-defense arose" must be a lengthy one encompassing prior hostilities between the parties. We are not persuaded. It has long been recognized that even the premeditation and deliberation necessary to support a conviction for first degree murder may be arrived at quickly; "[t]he true test is not the duration of time as much as it is the extent of the reflection." (*People v. Thomas* (1945) 25 Cal.2d 880, 900; see also *People v. Potts* (2019) 6 Cal.5th 1012, 1027 [quoting *Thomas*].) Appellant has offered no basis from which to conclude that the intent to engage in a physical altercation must be fostered or expressed over a longer duration. Indeed, after *Ross* was decided in 2007, CALCRIM No. 3471—which both parties accept as accurate—"was revised to add in brackets: 'A fight is *mutual combat* when it began or continued by mutual assent or agreement.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1050.) No time element for that assent or agreement was included. We find no error in the trial court instructing the jury regarding mutual combat.

## III. Sentencing

### A. Background

Appellant was convicted of both intimidating C.G. (§ 137, subd. (b)) and dissuading him by force or threat (§ 136.1, subd. (c)(1)). The trial court imposed a high-term, second strike sentence of eight years on the dissuasion count and a concurrent midterm sentence of three years on the intimidation count. Appellant contends this was error, "because the evidence supporting these counts—Tic's intimidating and threatening

statements to [C.G.], as inspired by appellant's comments to Tic in their recorded jail phone calls—had the single intent and objective of persuading [C.G.] not to provide damaging testimony against appellant."

### B.    Legal Principles and Standard of Review

Section 654, subdivision (a), provides in relevant part that an "act or omission that is punishable in different ways by different provisions of law shall be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a)(1).) Section 654 thus bars multiple punishments for a single act. (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143 (*Jones*).) It also bars multiple punishments for acts that comprise an indivisible course of conduct. (*Ibid.*) Whether a course of conduct is divisible and accordingly gives rise to more than one act for purposes of section 654 depends on the defendant's intent and objective. (*Ibid.*; see also *People v. Jackson* (2016) 1 Cal.5th 269, 354 (*Jackson*).) If multiple offenses were incident to a single objective, the defendant may be punished for any one of the offenses, but no more than one of them. (*Jackson, supra*, 1 Cal.5th at p. 354.) On the other hand, a defendant who harbored multiple objectives, independent of and not merely incident to one another, may be punished for each violation even if the violations share common acts or composed an otherwise indivisible course of conduct. (*Jones, supra*, 103 Cal.App.4th at p. 1143.)

"Intent and objective are factual questions for the trial court." (*Jackson, supra*, 1 Cal.5th at p. 354.) Accordingly, the trial court's "express or implied determination that two crimes were separate, involving separate objectives, must be upheld on appeal if supported by substantial evidence." (*People v. Brents* (2012) 53 Cal.4th 599, 618.)

30

**C.     Analysis**

While acknowledging that the evidence showed Tic made "two sets of comments" to C.G., and those comments "were separated by weeks," appellant contends "there was still just one intent and objective" because there was "only one phone call in which appellant urged Tic to talk to" C.G.  He further asserts that "the second incident on which the second count is based did not create a new risk of harm that was in any way different from the risk of harm resulting from the incident on the first count." Substantial evidence supported the trial court's implicit conclusions to the contrary.

Appellant was convicted of both crimes as an aider and abettor of Tic.  Evidence showed that Tic contacted C.G. twice. On the first occasion, when C.G. met him at the gas station, Tic told C.G. "to go in and plead the fifth.  Don't say anything."  On the second occasion several weeks later, Tic explicitly threatened to "do bad things to" or "kill" C.G. if he did not "go in and plead the fifth to make up" for talking to the police.  He also told C.G. he would track him and his family members down if C.G. "ran." The trial court reasonably could conclude these escalating threats "were not connected because [Tic] made them at different times at different places." (*People v. Felix* (2001) 92 Cal.App.4th 905, 915.) Moreover, the first comment was directed only at C.G., while the second threatened C.G.'s family members as well.  The trial court reasonably could conclude from this that appellant— through Tic—intended the second threat to cause new emotional harm to C.G.  (See *id.* at pp. 915-916.)  Appellant's attempt to distinguish *Felix* on the basis that C.G.'s testimony "did not identify any different level of harm or any different kind of harm" accordingly is unpersuasive.

## IV.    Abstract of Judgment

The original information filed in this case identified appellant as "Roy Eddy Ramos."  During trial, appellant informed the court that his true name was "Roy Eddie Ramos, Jr.," with the middle name spelled E-D-D-I-E.  The court ordered the information amended "to add both the correct spelling and the middle name."  The information subsequently was amended to reflect these changes.  The court did not order any other documents corrected.  The abstracts of judgment list appellant's name as "Roy Eddy Ramos."

Appellant "respectfully submits that this Court should order the trial court to file amended abstracts of judgment" to accurately reflect his true name.  Respondent "agrees that the abstract of judgment should be corrected."  We agree with the parties that these errors should be corrected.

We have the inherent authority to correct clerical errors at any time, including those in the minute order and abstract of judgment.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)  We accordingly order the trial court to correct the abstracts of judgment to reflect appellant's true name, Roy Eddie Ramos, Jr. The court shall forward a copy of the corrected abstracts to the Department of Corrections and Rehabilitation.

## DISPOSITION

The trial court shall correct the abstracts of judgment to reflect appellant's true name as set forth above, and forward a certified copy of the amended abstracts of judgment to the Department of Corrections and Rehabilitation.  The judgment is affirmed in all other respects.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

CURREY, P.J.

ZUKIN, J.